(Slip Opinion) OCTOBER TERM, 2017 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SOUTH DAKOTA *v.* WAYFAIR, INC., ET AL.

### CERTIORARI TO THE SUPREME COURT OF SOUTH DAKOTA

No. 17–494.   Argued April 17, 2018—Decided June 21, 2018

South Dakota, like many States, taxes the retail sales of goods and services in the State.  Sellers are required to collect and remit the tax to the State, but if they do not then in-state consumers are responsible for paying a use tax at the same rate.  Under *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753, and *Quill Corp.* v. *North Dakota*, 504 U. S. 298, South Dakota may not require a business that has no physical presence in the State to collect its sales tax.  Consumer compliance rates are notoriously low, however, and it is estimated that *Bellas Hess* and *Quill* cause South Dakota to lose between $48 and $58 million annually.  Concerned about the erosion of its sales tax base and corresponding loss of critical funding for state and local services, the South Dakota Legislature enacted a law requiring out-of-state sellers to collect and remit sales tax "as if the seller had a physical presence in the State."  The Act covers only sellers that, on an annual basis, deliver more than $100,000 of goods or services into the State or engage in 200 or more separate transactions for the delivery of goods or services into the State.  Respondents, top online retailers with no employees or real estate in South Dakota, each meet the Act's minimum sales or transactions requirement, but do not collect the State's sales tax.  South Dakota filed suit in state court, seeking a declaration that the Act's requirements are valid and applicable to respondents and an injunction requiring respondents to register for licenses to collect and remit the sales tax.  Respondents sought summary judgment, arguing that the Act is unconstitutional.  The trial court granted their motion.  The State Supreme Court affirmed on the ground that *Quill* is controlling precedent.

*Held*: Because the physical presence rule of *Quill* is unsound and incorrect, *Quill Corp.* v. *North Dakota*, 504 U. S. 298, and *National Bellas*

*Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753, are over-
ruled. Pp. 5–24.

  (a) An understanding of this Court's Commerce Clause principles
and their application to state taxes is instructive here. Pp. 5–9.

    (1) Two primary principles mark the boundaries of a State's au-
thority to regulate interstate commerce: State regulations may not
discriminate against interstate commerce; and States may not im-
pose undue burdens on interstate commerce. These principles guide
the courts in adjudicating challenges to state laws under the Com-
merce Clause. Pp. 5–7.

    (2) They also animate Commerce Clause precedents addressing
the validity of state taxes, which will be sustained so long as they (1)
apply to an activity with a substantial nexus with the taxing State,
(2) are fairly apportioned, (3) do not discriminate against interstate
commerce, and (4) are fairly related to the services the State pro-
vides. See *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279.
Before *Complete Auto*, the Court held in *Bellas Hess* that a "seller
whose only connection with customers in the State is by common car-
rier or . . . mail" lacked the requisite minimum contacts with the
State required by the Due Process Clause and the Commerce Clause,
and that unless the retailer maintained a physical presence in the
State, the State lacked the power to require that retailer to collect a
local tax. 386 U. S., at 758. In *Quill*, the Court overruled the due
process holding, but not the Commerce Clause holding, grounding the
physical presence rule in *Complete Auto*'s requirement that a tax
have a "substantial nexus" with the activity being taxed. Pp. 7–9.

  (b) The physical presence rule has long been criticized as giving
out-of-state sellers an advantage. Each year, it becomes further re-
moved from economic reality and results in significant revenue losses
to the States. These critiques underscore that the rule, both as first
formulated and as applied today, is an incorrect interpretation of the
Commerce Clause. Pp. 9–17.

    (1) *Quill* is flawed on its own terms. First, the physical presence
rule is not a necessary interpretation of *Complete Auto*'s nexus re-
quirement. That requirement is "closely related," *Bellas Hess*, 386
U. S. at 756, to the due process requirement that there be "some defi-
nite link, some minimum connection, between a state and the person,
property or transaction it seeks to tax." *Miller Brothers Co.* v. *Mary-
land*, 347 U. S. 340, 344–345. And, as *Quill* itself recognized, a busi-
ness need not have a physical presence in a State to satisfy the de-
mands of due process. When considering whether a State may levy a
tax, Due Process and Commerce Clause standards, though not identi-
cal or coterminous, have significant parallels. The reasons given in
*Quill* for rejecting the physical presence rule for due process purposes

apply as well to the question whether physical presence is a requisite for an out-of-state seller's liability to remit sales taxes. Other aspects of the Court's doctrine can better and more accurately address potential burdens on interstate commerce, whether or not *Quill*'s physical presence rule is satisfied.

Second, *Quill* creates rather than resolves market distortions. In effect, it is a judicially created tax shelter for businesses that limit their physical presence in a State but sell their goods and services to the State's consumers, something that has become easier and more prevalent as technology has advanced. The rule also produces an incentive to avoid physical presence in multiple States, affecting development that might be efficient or desirable.

Third, *Quill* imposes the sort of arbitrary, formalistic distinction that the Court's modern Commerce Clause precedents disavow in favor of "a sensitive, case-by-case analysis of purposes and effects," *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 201. It treats economically identical actors differently for arbitrary reasons. For example, a business that maintains a few items of inventory in a small warehouse in a State is required to collect and remit a tax on all of its sales in the State, while a seller with a pervasive Internet presence cannot be subject to the same tax for the sales of the same items. Pp. 10–14.

(2) When the day-to-day functions of marketing and distribution in the modern economy are considered, it becomes evident that *Quill*'s physical presence rule is artificial, not just "at its edges," 504 U. S. at 315, but in its entirety. Modern e-commerce does not align analytically with a test that relies on the sort of physical presence defined in *Quill*. And the Court should not maintain a rule that ignores substantial virtual connections to the State. Pp. 14–15.

(3) The physical presence rule of *Bellas Hess* and *Quill* is also an extraordinary imposition by the Judiciary on States' authority to collect taxes and perform critical public functions. Forty-one States, two Territories, and the District of Columbia have asked the Court to reject *Quill*'s test. Helping respondents' customers evade a lawful tax unfairly shifts an increased share of the taxes to those consumers who buy from competitors with a physical presence in the State. It is essential to public confidence in the tax system that the Court avoid creating inequitable exceptions. And it is also essential to the confidence placed in the Court's Commerce Clause decisions. By giving some online retailers an arbitrary advantage over their competitors who collect state sales taxes, *Quill*'s physical presence rule has limited States' ability to seek long-term prosperity and has prevented market participants from competing on an even playing field. Pp. 16–17.

(c) *Stare decisis* can no longer support the Court's prohibition of a valid exercise of the States' sovereign power. If it becomes apparent that the Court's Commerce Clause decisions prohibit the States from exercising their lawful sovereign powers, the Court should be vigilant in correcting the error. It is inconsistent with this Court's proper role to ask Congress to address a false constitutional premise of this Court's own creation. The Internet revolution has made *Quill'*s original error all the more egregious and harmful. The *Quill* Court did not have before it the present realities of the interstate marketplace, where the Internet's prevalence and power have changed the dynamics of the national economy. The expansion of e-commerce has also increased the revenue shortfall faced by States seeking to collect their sales and use taxes, leading the South Dakota Legislature to declare an emergency. The argument, moreover, that the physical presence rule is clear and easy to apply is unsound, as attempts to apply the physical presence rule to online retail sales have proved unworkable.

Because the physical presence rule as defined by *Quill* is no longer a clear or easily applicable standard, arguments for reliance based on its clarity are misplaced. *Stare decisis* may accommodate "legitimate reliance interest[s]," *United States* v. *Ross*, 456 U. S. 798, 824, but a business "is in no position to found a constitutional right . . . on the practical opportunities for tax avoidance," *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359, 366. Startups and small businesses may benefit from the physical presence rule, but here South Dakota affords small merchants a reasonable degree of protection. Finally, other aspects of the Court's Commerce Clause doctrine can protect against any undue burden on interstate commerce, taking into consideration the small businesses, startups, or others who engage in commerce across state lines. The potential for such issues to arise in some later case cannot justify retaining an artificial, anachronistic rule that deprives States of vast revenues from major businesses. Pp. 17–22.

(d) In the absence of *Quill* and *Bellas Hess*, the first prong of the *Complete Auto* test simply asks whether the tax applies to an activity with a substantial nexus with the taxing State, 430 U. S., at 279. Here, the nexus is clearly sufficient. The Act applies only to sellers who engage in a significant quantity of business in the State, and respondents are large, national companies that undoubtedly maintain an extensive virtual presence. Any remaining claims regarding the Commerce Clause's application in the absence of *Quill* and *Bellas Hess* may be addressed in the first instance on remand. Pp. 22–23.

2017 S.D. 56, 901 N. W. 2d 754, vacated and remanded.

KENNEDY, J., delivered the opinion of the Court, in which THOMAS,

Syllabus

GINSBURG, ALITO, and GORSUCH, JJ., joined. THOMAS, J., and GORSUCH, J., filed concurring opinions. ROBERTS, C. J., filed a dissenting opinion, in which BREYER, SOTOMAYOR, and KAGAN, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 17–494

## SOUTH DAKOTA, PETITIONER *v.* WAYFAIR, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF SOUTH DAKOTA

[June 21, 2018]

JUSTICE KENNEDY delivered the opinion of the Court.

When a consumer purchases goods or services, the consumer's State often imposes a sales tax. This case requires the Court to determine when an out-of-state seller can be required to collect and remit that tax. All concede that taxing the sales in question here is lawful. The question is whether the out-of-state seller can be held responsible for its payment, and this turns on a proper interpretation of the Commerce Clause, U. S. Const., Art. I, §8, cl. 3.

In two earlier cases the Court held that an out-of-state seller's liability to collect and remit the tax to the consumer's State depended on whether the seller had a physical presence in that State, but that mere shipment of goods into the consumer's State, following an order from a catalog, did not satisfy the physical presence requirement. *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967); *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992). The Court granted certiorari here to reconsider the scope and validity of the physical presence rule mandated by those cases.

# I

Like most States, South Dakota has a sales tax. It taxes the retail sales of goods and services in the State. S. D. Codified Laws §§10–45–2, 10–45–4 (2010 and Supp. 2017). Sellers are generally required to collect and remit this tax to the Department of Revenue. §10–45–27.3. If for some reason the sales tax is not remitted by the seller, then in-state consumers are separately responsible for paying a use tax at the same rate. See §§10–46–2, 10–46–4, 10–46–6. Many States employ this kind of complementary sales and use tax regime.

Under this Court's decisions in *Bellas Hess* and *Quill*, South Dakota may not require a business to collect its sales tax if the business lacks a physical presence in the State. Without that physical presence, South Dakota instead must rely on its residents to pay the use tax owed on their purchases from out-of-state sellers. "[T]he impracticability of [this] collection from the multitude of individual purchasers is obvious." *National Geographic Soc.* v. *California Bd. of Equalization*, 430 U. S. 551, 555 (1977). And consumer compliance rates are notoriously low. See, *e.g.,* GAO, Report to Congressional Requesters: Sales Taxes, States Could Gain Revenue from Expanded Authority, but Businesses Are Likely to Experience Compliance Costs 5 (GAO–18–114, Nov. 2017) (Sales Taxes Report); California State Bd. of Equalization, Revenue Estimate: Electronic Commerce and Mail Order Sales 7 (2013) (Table 3) (estimating a 4 percent collection rate). It is estimated that *Bellas Hess* and *Quill* cause the States to lose between $8 and $33 billion every year. See Sales Taxes Report, at 11–12 (estimating $8 to $13 billion); Brief for Petitioner 34–35 (citing estimates of $23 and $33.9 billion). In South Dakota alone, the Department of Revenue estimates revenue loss at $48 to $58 million annually. App. 24. Particularly because South Dakota has no state income tax, it must put substantial reliance on its sales

and use taxes for the revenue necessary to fund essential services. Those taxes account for over 60 percent of its general fund.

In 2016, South Dakota confronted the serious inequity *Quill* imposes by enacting S. 106—"An Act to provide for the collection of sales taxes from certain remote sellers, to establish certain Legislative findings, and to declare an emergency." S. 106, 2016 Leg. Assembly, 91st Sess. (S. D. 2016) (S. B. 106). The legislature found that the inability to collect sales tax from remote sellers was "seriously eroding the sales tax base" and "causing revenue losses and imminent harm . . . through the loss of critical funding for state and local services." §8(1). The legislature also declared an emergency: "Whereas, this Act is necessary for the support of the state government and its existing public institutions, an emergency is hereby declared to exist." §9. Fearing further erosion of the tax base, the legislature expressed its intention to "apply South Dakota's sales and use tax obligations to the limit of federal and state constitutional doctrines" and noted the urgent need for this Court to reconsider its precedents. §§8(11), (8).

To that end, the Act requires out-of-state sellers to collect and remit sales tax "as if the seller had a physical presence in the state." §1. The Act applies only to sellers that, on an annual basis, deliver more than $100,000 of goods or services into the State or engage in 200 or more separate transactions for the delivery of goods or services into the State. *Ibid.* The Act also forecloses the retroactive application of this requirement and provides means for the Act to be appropriately stayed until the constitutionality of the law has been clearly established. §§5, 3, 8(10).

Respondents Wayfair, Inc., Overstock.com, Inc., and Newegg, Inc., are merchants with no employees or real estate in South Dakota. Wayfair, Inc., is a leading online

retailer of home goods and furniture and had net revenues of over $4.7 billion last year. Overstock.com, Inc., is one of the top online retailers in the United States, selling a wide variety of products from home goods and furniture to clothing and jewelry; and it had net revenues of over $1.7 billion last year. Newegg, Inc., is a major online retailer of consumer electronics in the United States. Each of these three companies ships its goods directly to purchasers throughout the United States, including South Dakota. Each easily meets the minimum sales or transactions requirement of the Act, but none collects South Dakota sales tax. 2017 S. D. 56, ¶¶ 10–11, 901 N. W. 2d 754, 759–760.

Pursuant to the Act's provisions for expeditious judicial review, South Dakota filed a declaratory judgment action against respondents in state court, seeking a declaration that the requirements of the Act are valid and applicable to respondents and an injunction requiring respondents to register for licenses to collect and remit sales tax. App. 11, 30. Respondents moved for summary judgment, arguing that the Act is unconstitutional. 901 N. W. 2d, at 759–760. South Dakota conceded that the Act cannot survive under *Bellas Hess* and *Quill* but asserted the importance, indeed the necessity, of asking this Court to review those earlier decisions in light of current economic realities. 901 N. W. 2d, at 760; see also S. B. 106, §8. The trial court granted summary judgment to respondents. App. to Pet. for Cert. 17a.

The South Dakota Supreme Court affirmed. It stated: "However persuasive the State's arguments on the merits of revisiting the issue, *Quill* has not been overruled [and] remains the controlling precedent on the issue of Commerce Clause limitations on interstate collection of sales and use taxes." 901 N. W. 2d, at 761. This Court granted certiorari. 583 U. S. ___ (2018).

II

The Constitution grants Congress the power "[t]o regu-late Commerce . . . among the several States." Art. I, §8, cl. 3. The Commerce Clause "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tenden-cies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Hughes* v. *Oklaho-ma*, 441 U. S. 322, 325–326 (1979). Although the Com-merce Clause is written as an affirmative grant of authority to Congress, this Court has long held that in some instances it imposes limitations on the States absent congressional action. Of course, when Congress exercises its power to regulate commerce by enacting legislation, the legislation controls. *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 769 (1945). But this Court has observed that "in general Congress has left it to the courts to formulate the rules" to preserve "the free flow of inter-state commerce." *Id.,* at 770.

To understand the issue presented in this case, it is instructive first to survey the general development of this Court's Commerce Clause principles and then to review the application of those principles to state taxes.

A

From early in its history, a central function of this Court has been to adjudicate disputes that require interpretation of the Commerce Clause in order to determine its mean-ing, its reach, and the extent to which it limits state regu-lations of commerce. *Gibbons* v. *Ogden*, 9 Wheat. 1 (1824), began setting the course by defining the meaning of com-merce. Chief Justice Marshall explained that commerce included both "the interchange of commodities" and "com-mercial intercourse." *Id.,* at 189, 193. A concurring opin-

ion further stated that Congress had the exclusive power to regulate commerce. See *id.,* at 236 (opinion of Johnson, J.). Had that latter submission prevailed and States been denied the power of concurrent regulation, history might have seen sweeping federal regulations at an early date that foreclosed the States from experimentation with laws and policies of their own, or, on the other hand, proposals to reexamine *Gibbons*' broad definition of commerce to accommodate the necessity of allowing States the power to enact laws to implement the political will of their people.

Just five years after *Gibbons*, however, in another opinion by Chief Justice Marshall, the Court sustained what in substance was a state regulation of interstate commerce. In *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245 (1829), the Court allowed a State to dam and bank a stream that was part of an interstate water system, an action that likely would have been an impermissible intrusion on the national power over commerce had it been the rule that only Congress could regulate in that sphere. See *id.,* at 252. Thus, by implication at least, the Court indicated that the power to regulate commerce in some circumstances was held by the States and Congress concurrently. And so both a broad interpretation of interstate commerce and the concurrent regulatory power of the States can be traced to *Gibbons* and *Willson*.

Over the next few decades, the Court refined the doctrine to accommodate the necessary balance between state and federal power. In *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots*, 12 How. 299 (1852), the Court addressed local laws regulating river pilots who operated in interstate waters and guided many ships on interstate or foreign voyages. The Court held that, while Congress surely could regulate on this subject had it chosen to act, the State, too, could regulate. The Court distinguished between those subjects that by their nature "imperatively deman[d] a single

uniform rule, operating equally on the commerce of the United States," and those that "deman[d] th[e] diversity, which alone can meet . . . local necessities." *Id.*, at 319. Though considerable uncertainties were yet to be overcome, these precedents still laid the groundwork for the analytical framework that now prevails for Commerce Clause cases.

This Court's doctrine has developed further with time. Modern precedents rest upon two primary principles that mark the boundaries of a State's authority to regulate interstate commerce. First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce. State laws that discriminate against interstate commerce face "a virtually *per se* rule of invalidity." *Granholm* v. *Heald*, 544 U. S. 460, 476 (2005) (internal quotation marks omitted). State laws that "regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970); see also *Southern Pacific*, *supra*, at 779. Although subject to exceptions and variations, see, *e.g., Hughes* v. *Alexandria Scrap Corp.*, 426 U. S. 794 (1976); *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573 (1986), these two principles guide the courts in adjudicating cases challenging state laws under the Commerce Clause.

B

These principles also animate the Court's Commerce Clause precedents addressing the validity of state taxes. The Court explained the now-accepted framework for state taxation in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274 (1977). The Court held that a State "may tax exclusively interstate commerce so long as the tax does not

create any effect forbidden by the Commerce Clause." *Id.*, at 285. After all, "interstate commerce may be required to pay its fair share of state taxes." *D. H. Holmes Co.* v. *McNamara*, 486 U. S. 24, 31 (1988). The Court will sustain a tax so long as it (1) applies to an activity with a substantial nexus with the taxing State, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services the State provides. See *Complete Auto*, *supra*, at 279.

Before *Complete Auto*, the Court had addressed a challenge to an Illinois tax that required out-of-state retailers to collect and remit taxes on sales made to consumers who purchased goods for use within Illinois. *Bellas Hess*, 386 U. S., at 754–755. The Court held that a mail-order company "whose only connection with customers in the State is by common carrier or the United States mail" lacked the requisite minimum contacts with the State required by both the Due Process Clause and the Commerce Clause. *Id.,* at 758. Unless the retailer maintained a physical presence such as "retail outlets, solicitors, or property within a State," the State lacked the power to require that retailer to collect a local use tax. *Ibid.* The dissent disagreed: "There should be no doubt that this large-scale, systematic, continuous solicitation and exploitation of the Illinois consumer market is a sufficient 'nexus' to require Bellas Hess to collect from Illinois customers and to remit the use tax." *Id.,* at 761–762 (opinion of Fortas, J., joined by Black and Douglas, JJ.).

In 1992, the Court reexamined the physical presence rule in *Quill*. That case presented a challenge to North Dakota's "attempt to require an out-of-state mail-order house that has neither outlets nor sales representatives in the State to collect and pay a use tax on goods purchased for use within the State." 504 U. S., at 301. Despite the fact that *Bellas Hess* linked due process and the Commerce Clause together, the Court in *Quill* overruled the

due process holding, but not the Commerce Clause holding; and it thus reaffirmed the physical presence rule. 504 U. S., at 307–308, 317–318.

The Court in *Quill* recognized that intervening precedents, specifically *Complete Auto*, "might not dictate the same result were the issue to arise for the first time today." 504 U. S., at 311. But, nevertheless, the *Quill* majority concluded that the physical presence rule was necessary to prevent undue burdens on interstate commerce. *Id.,* at 313, and n. 6. It grounded the physical presence rule in *Complete Auto*'s requirement that a tax have a "'substantial nexus'" with the activity being taxed. 504 U. S., at 311.

Three Justices based their decision to uphold the physical presence rule on *stare decisis* alone. *Id.*, at 320 (Scalia, J., joined by KENNEDY and THOMAS, JJ., concurring in part and concurring in judgment). Dissenting in relevant part, Justice White argued that "there is no relationship between the physical-presence/nexus rule the Court retains and Commerce Clause considerations that allegedly justify it." *Id.*, at 327 (opinion concurring in part and dissenting in part).

## III

The physical presence rule has "been the target of criticism over many years from many quarters." *Direct Marketing Assn.* v. *Brohl*, 814 F. 3d 1129, 1148, 1150–1151 (CA10 2016) (Gorsuch, J., concurring). *Quill*, it has been said, was "premised on assumptions that are unfounded" and "riddled with internal inconsistencies." Rothfeld, *Quill*: Confusing the Commerce Clause, 56 Tax Notes 487, 488 (1992*). Quill* created an inefficient "online sales tax loophole" that gives out-of-state businesses an advantage. A. Laffer & D. Arduin, Pro-Growth Tax Reform and E-Fairness 1, 4 (July 2013). And "while nexus rules are clearly necessary," the Court "should focus on rules that

are appropriate to the twenty-first century, not the nine-teenth." Hellerstein, Deconstructing the Debate Over State Taxation of Electronic Commerce, 13 Harv. J. L. & Tech. 549, 553 (2000). Each year, the physical presence rule becomes further removed from economic reality and results in significant revenue losses to the States. These critiques underscore that the physical presence rule, both as first formulated and as applied today, is an incorrect interpretation of the Commerce Clause.

### A

*Quill* is flawed on its own terms. First, the physical presence rule is not a necessary interpretation of the requirement that a state tax must be "applied to an activity with a substantial nexus with the taxing State." *Complete Auto*, 430 U. S., at 279. Second, *Quill* creates rather than resolves market distortions. And third, *Quill* imposes the sort of arbitrary, formalistic distinction that the Court's modern Commerce Clause precedents disavow.

### 1

All agree that South Dakota has the authority to tax these transactions. S. B. 106 applies to sales of "tangible personal property, products transferred electronically, or services *for delivery into South Dakota.*" §1 (emphasis added). "It has long been settled" that the sale of goods or services "has a sufficient nexus to the State in which the sale is consummated to be treated as a local transaction taxable by that State." *Oklahoma Tax Comm'n* v. *Jefferson Lines, Inc.*, 514 U. S. 175, 184 (1995); see also 2 C. Trost & P. Hartman, Federal Limitations on State and Local Taxation 2d §11:1, p. 471 (2003) ("Generally speaking, a sale is attributable to its destination").

The central dispute is whether South Dakota may require remote sellers to collect and remit the tax without some additional connection to the State. The Court has

previously stated that "[t]he imposition on the seller of the duty to insure collection of the tax from the purchaser does not violate the [C]ommerce [C]lause." *McGoldrick* v. *Berwind-White Coal Mining Co.*, 309 U. S. 33, 50, n. 9 (1940). It is a "'familiar and sanctioned device.'" *Scripto, Inc.* v. *Carson*, 362 U. S. 207, 212 (1960). There just must be "a substantial nexus with the taxing State." *Complete Auto*, *supra*, at 279.

This nexus requirement is "closely related," *Bellas Hess*, 386 U. S., at 756, to the due process requirement that there be "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax," *Miller Brothers Co.* v. *Maryland*, 347 U. S. 340, 344–345 (1954). It is settled law that a business need not have a physical presence in a State to satisfy the demands of due process. *Burger King Corp.* v. *Rudzewicz*, 471 U. S. 462, 476 (1985). Although physical presence "'frequently will enhance'" a business' connection with a State, "'it is an inescapable fact of modern commercial life that a substantial amount of business is transacted . . . [with no] need for physical presence within a State in which business is conducted.'" *Quill*, 504 U. S., at 308. *Quill* itself recognized that "[t]he requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing State." *Ibid.*

When considering whether a State may levy a tax, Due Process and Commerce Clause standards may not be identical or coterminous, but there are significant parallels. The reasons given in *Quill* for rejecting the physical presence rule for due process purposes apply as well to the question whether physical presence is a requisite for an out-of-state seller's liability to remit sales taxes. Physical presence is not necessary to create a substantial nexus.

The *Quill* majority expressed concern that without the physical presence rule "a state tax might unduly burden interstate commerce" by subjecting retailers to tax-

collection obligations in thousands of different taxing jurisdictions. *Id.*, at 313, n. 6. But the administrative costs of compliance, especially in the modern economy with its Internet technology, are largely unrelated to whether a company happens to have a physical presence in a State. For example, a business with one salesperson in each State must collect sales taxes in every jurisdiction in which goods are delivered; but a business with 500 salespersons in one central location and a website accessible in every State need not collect sales taxes on otherwise identical nationwide sales. In other words, under *Quill*, a small company with diverse physical presence might be equally or more burdened by compliance costs than a large remote seller. The physical presence rule is a poor proxy for the compliance costs faced by companies that do business in multiple States. Other aspects of the Court's doctrine can better and more accurately address any potential burdens on interstate commerce, whether or not *Quill*'s physical presence rule is satisfied.

2

The Court has consistently explained that the Commerce Clause was designed to prevent States from engaging in economic discrimination so they would not divide into isolated, separable units. See *Philadelphia* v. *New Jersey*, 437 U. S. 617, 623 (1978). But it is "not the purpose of the [C]ommerce [C]lause to relieve those engaged in interstate commerce from their just share of state tax burden." *Complete Auto*, *supra*, at 288 (internal quotation marks omitted). And it is certainly not the purpose of the Commerce Clause to permit the Judiciary to create market distortions. "If the Commerce Clause was intended to put businesses on an even playing field, the [physical presence] rule is hardly a way to achieve that goal." *Quill*, *supra*, at 329 (opinion of White, J.).

*Quill* puts both local businesses and many interstate

businesses with physical presence at a competitive disadvantage relative to remote sellers. Remote sellers can avoid the regulatory burdens of tax collection and can offer *de facto* lower prices caused by the widespread failure of consumers to pay the tax on their own. This "guarantees a competitive benefit to certain firms simply because of the organizational form they choose" while the rest of the Court's jurisprudence "is all about preventing discrimination between firms." *Direct Marketing*, 814 F. 3d, at 1150–1151 (Gorsuch, J., concurring). In effect, *Quill* has come to serve as a judicially created tax shelter for businesses that decide to limit their physical presence and still sell their goods and services to a State's consumers—something that has become easier and more prevalent as technology has advanced.

Worse still, the rule produces an incentive to avoid physical presence in multiple States. Distortions caused by the desire of businesses to avoid tax collection mean that the market may currently lack storefronts, distribution points, and employment centers that otherwise would be efficient or desirable. The Commerce Clause must not prefer interstate commerce only to the point where a merchant physically crosses state borders. Rejecting the physical presence rule is necessary to ensure that artificial competitive advantages are not created by this Court's precedents. This Court should not prevent States from collecting lawful taxes through a physical presence rule that can be satisfied only if there is an employee or a building in the State.

3

The Court's Commerce Clause jurisprudence has "eschewed formalism for a sensitive, case-by-case analysis of purposes and effects." *West Lynn Creamery, Inc.* v. *Healy*, 512 U. S. 186, 201 (1994). *Quill*, in contrast, treats economically identical actors differently, and for arbitrary

reasons.

Consider, for example, two businesses that sell furniture online. The first stocks a few items of inventory in a small warehouse in North Sioux City, South Dakota. The second uses a major warehouse just across the border in South Sioux City, Nebraska, and maintains a sophisticated website with a virtual showroom accessible in every State, including South Dakota. By reason of its physical presence, the first business must collect and remit a tax on all of its sales to customers from South Dakota, even those sales that have nothing to do with the warehouse. See *National Geographic*, 430 U. S., at 561; *Scripto, Inc.*, 362 U. S., at 211–212. But, under *Quill*, the second, hypothetical seller cannot be subject to the same tax for the sales of the same items made through a pervasive Internet presence. This distinction simply makes no sense. So long as a state law avoids "any effect forbidden by the Commerce Clause," *Complete Auto*, 430 U. S., at 285, courts should not rely on anachronistic formalisms to invalidate it. The basic principles of the Court's Commerce Clause jurisprudence are grounded in functional, marketplace dynamics; and States can and should consider those realities in enacting and enforcing their tax laws.

B

The *Quill* Court itself acknowledged that the physical presence rule is "artificial at its edges." 504 U. S., at 315. That was an understatement when *Quill* was decided; and when the day-to-day functions of marketing and distribution in the modern economy are considered, it is all the more evident that the physical presence rule is artificial in its entirety.

Modern e-commerce does not align analytically with a test that relies on the sort of physical presence defined in *Quill*. In a footnote, *Quill* rejected the argument that "title to 'a few floppy diskettes' present in a State" was

sufficient to constitute a "substantial nexus," *id.*, at 315, n. 8. But it is not clear why a single employee or a single warehouse should create a substantial nexus while "physical" aspects of pervasive modern technology should not. For example, a company with a website accessible in South Dakota may be said to have a physical presence in the State via the customers' computers. A website may leave cookies saved to the customers' hard drives, or customers may download the company's app onto their phones. Or a company may lease data storage that is permanently, or even occasionally, located in South Dakota. Cf. *United States* v. *Microsoft Corp.*, 584 U. S. \_\_\_ (2018) (*per curiam*). What may have seemed like a "clear," "bright-line tes[t]" when *Quill* was written now threatens to compound the arbitrary consequences that should have been apparent from the outset. 504 U. S., at 315.

The "dramatic technological and social changes" of our "increasingly interconnected economy" mean that buyers are "closer to most major retailers" than ever before— "regardless of how close or far the nearest storefront." *Direct Marketing Assn.* v. *Brohl*, 575 U. S. \_\_\_, \_\_\_, \_\_\_ (2015) (KENNEDY, J., concurring) (slip op., at 2, 3). Between targeted advertising and instant access to most consumers via any internet-enabled device, "a business may be present in a State in a meaningful way without" that presence "being physical in the traditional sense of the term." *Id.*, at \_\_\_ (slip op., at 3). A virtual showroom can show far more inventory, in far more detail, and with greater opportunities for consumer and seller interaction than might be possible for local stores. Yet the continuous and pervasive virtual presence of retailers today is, under *Quill*, simply irrelevant. This Court should not maintain a rule that ignores these substantial virtual connections to the State.

### C

The physical presence rule as defined and enforced in *Bellas Hess* and *Quill* is not just a technical legal problem—it is an extraordinary imposition by the Judiciary on States' authority to collect taxes and perform critical public functions. Forty-one States, two Territories, and the District of Columbia now ask this Court to reject the test formulated in *Quill*. See Brief for Colorado et al. as *Amici Curiae*. *Quill*'s physical presence rule intrudes on States' reasonable choices in enacting their tax systems. And that it allows remote sellers to escape an obligation to remit a lawful state tax is unfair and unjust. It is unfair and unjust to those competitors, both local and out of State, who must remit the tax; to the consumers who pay the tax; and to the States that seek fair enforcement of the sales tax, a tax many States for many years have considered an indispensable source for raising revenue.

In essence, respondents ask this Court to retain a rule that allows their customers to escape payment of sales taxes—taxes that are essential to create and secure the active market they supply with goods and services. An example may suffice. Wayfair offers to sell a vast selection of furnishings. Its advertising seeks to create an image of beautiful, peaceful homes, but it also says that "'[o]ne of the best things about buying through Wayfair is that we do not have to charge sales tax.'" Brief for Petitioner 55. What Wayfair ignores in its subtle offer to assist in tax evasion is that creating a dream home assumes solvent state and local governments. State taxes fund the police and fire departments that protect the homes containing their customers' furniture and ensure goods are safely delivered; maintain the public roads and municipal services that allow communication with and access to customers; support the "sound local banking institutions to support credit transactions [and] courts to ensure collection of the purchase price," *Quill*, 504 U. S., at 328 (opin-

ion of White, J.); and help create the "climate of consumer confidence" that facilitates sales, see *ibid.* According to respondents, it is unfair to stymie their tax-free solicitation of customers. But there is nothing unfair about requiring companies that avail themselves of the States' benefits to bear an equal share of the burden of tax collection. Fairness dictates quite the opposite result. Helping respondents' customers evade a lawful tax unfairly shifts to those consumers who buy from their competitors with a physical presence that satisfies *Quill*—even one warehouse or one salesperson—an increased share of the taxes. It is essential to public confidence in the tax system that the Court avoid creating inequitable exceptions. This is also essential to the confidence placed in this Court's Commerce Clause decisions. Yet the physical presence rule undermines that necessary confidence by giving some online retailers an arbitrary advantage over their competitors who collect state sales taxes.

In the name of federalism and free markets, *Quill* does harm to both. The physical presence rule it defines has limited States' ability to seek long-term prosperity and has prevented market participants from competing on an even playing field.

## IV

"Although we approach the reconsideration of our decisions with the utmost caution, *stare decisis* is not an inexorable command." *Pearson* v. *Callahan*, 555 U. S. 223, 233 (2009) (quoting *State Oil Co.* v. *Khan*, 522 U. S. 3, 20 (1997); alterations and internal quotation marks omitted). Here, *stare decisis* can no longer support the Court's prohibition of a valid exercise of the States' sovereign power.

If it becomes apparent that the Court's Commerce Clause decisions prohibit the States from exercising their lawful sovereign powers in our federal system, the Court should be vigilant in correcting the error. While it can be

conceded that Congress has the authority to change the physical presence rule, Congress cannot change the constitutional default rule.  It is inconsistent with the Court's proper role to ask Congress to address a false constitutional premise of this Court's own creation.  Courts have acted as the front line of review in this limited sphere; and hence it is important that their principles be accurate and logical, whether or not Congress can or will act in response.  It is currently the Court, and not Congress, that is limiting the lawful prerogatives of the States.

Further, the real world implementation of Commerce Clause doctrines now makes it manifest that the physical presence rule as defined by *Quill* must give way to the "far-reaching systemic and structural changes in the economy" and "many other societal dimensions" caused by the Cyber Age.  *Direct Marketing*, 575 U. S., at ___ (KENNEDY, J., concurring) (slip op., at 3).  Though *Quill* was wrong on its own terms when it was decided in 1992, since then the Internet revolution has made its earlier error all the more egregious and harmful.

The *Quill* Court did not have before it the present realities of the interstate marketplace.  In 1992, less than 2 percent of Americans had Internet access.  See Brief for Retail Litigation Center, Inc., et al. as *Amici Curiae* 11, and n. 10.  Today that number is about 89 percent.  *Ibid.,* and n. 11.  When it decided *Quill*, the Court could not have envisioned a world in which the world's largest retailer would be a remote seller, S. Li, Amazon Overtakes Wal-Mart as Biggest Retailer, L. A. Times, July 24, 2015, http://www. latimes.com/business/la-fi-amazon-walmart-20150724-story.html (all Internet materials as last visited June 18, 2018).

The Internet's prevalence and power have changed the dynamics of the national economy.  In 1992, mail-order sales in the United States totaled $180 billion.  504 U. S., at 329 (opinion of White, J.).  Last year, e-commerce retail

sales alone were estimated at $453.5 billion. Dept. of Commerce, U. S. Census Bureau News, Quarterly Retail E-Commerce Sales: 4th Quarter 2017 (CB18–21, Feb. 16, 2018). Combined with traditional remote sellers, the total exceeds half a trillion dollars. Sales Taxes Report, at 9. Since the Department of Commerce first began tracking e-commerce sales, those sales have increased tenfold from 0.8 percent to 8.9 percent of total retail sales in the United States. Compare Dept. of Commerce, U. S. Census Bureau, Retail E-Commerce Sales in Fourth Quarter 2000 (CB01–28, Feb. 16, 2001), https://www.census.gov/mrts/www/data/pdf/00Q4.pdf, with U. S. Census Bureau News, Quarterly Retail E-Commerce Sales: 4th Quarter 2017. And it is likely that this percentage will increase. Last year, e-commerce grew at four times the rate of traditional retail, and it shows no sign of any slower pace. See *ibid.*

This expansion has also increased the revenue shortfall faced by States seeking to collect their sales and use taxes. In 1992, it was estimated that the States were losing between $694 million and $3 billion per year in sales tax revenues as a result of the physical presence rule. Brief for Law Professors et al. as *Amici Curiae* 11, n. 7. Now estimates range from $8 to $33 billion. Sales Taxes Report, at 11–12; Brief for Petitioner 34–35. The South Dakota Legislature has declared an emergency, S. B. 106, §9, which again demonstrates urgency of overturning the physical presence rule.

The argument, moreover, that the physical presence rule is clear and easy to apply is unsound. Attempts to apply the physical presence rule to online retail sales are proving unworkable. States are already confronting the complexities of defining physical presence in the Cyber Age. For example, Massachusetts proposed a regulation that would have defined physical presence to include making apps available to be downloaded by in-state residents and placing cookies on in-state residents' web

browsers. See 830 Code Mass. Regs. 64H.1.7 (2017). Ohio recently adopted a similar standard. See Ohio Rev. Code Ann. §5741.01(I)(2)(i) (Lexis Supp. 2018). Some States have enacted so-called "click through" nexus statutes, which define nexus to include out-of-state sellers that contract with in-state residents who refer customers for compensation. See *e.g.,* N. Y. Tax Law Ann. §1101(b)(8)(vi) (West 2017); Brief for Tax Foundation as *Amicus Curiae* 20–22 (listing 21 States with similar statutes). Others still, like Colorado, have imposed notice and reporting requirements on out-of-state retailers that fall just short of actually collecting and remitting the tax. See *Direct Marketing*, 814 F. 3d, at 1133 (discussing Colo. Rev. Stat. §39–21–112(3.5)); Brief for Tax Foundation 24–26 (listing nine States with similar statutes). Statutes of this sort are likely to embroil courts in technical and arbitrary disputes about what counts as physical presence.

Reliance interests are a legitimate consideration when the Court weighs adherence to an earlier but flawed precedent. See *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. ___, ___–___ (2015) (slip op., at 9–10). But even on its own terms, the physical presence rule as defined by *Quill* is no longer a clear or easily applicable standard, so arguments for reliance based on its clarity are misplaced. And, importantly, *stare decisis* accommodates only "legitimate reliance interest[s]." *United States* v. *Ross*, 456 U. S. 798, 824 (1982). Here, the tax distortion created by *Quill* exists in large part because consumers regularly fail to comply with lawful use taxes. Some remote retailers go so far as to advertise sales as tax free. See S. B. 106, §8(3); see also Brief for Petitioner 55. A business "is in no position to found a constitutional right on the practical opportunities for tax avoidance." *Nelson* v. *Sears, Roebuck & Co.*, 312 U. S. 359, 366 (1941).

Respondents argue that "the physical presence rule has permitted start-ups and small businesses to use the Inter-

net as a means to grow their companies and access a national market, without exposing them to the daunting complexity and business-development obstacles of nation-wide sales tax collection." Brief for Respondents 29. These burdens may pose legitimate concerns in some instances, particularly for small businesses that make a small volume of sales to customers in many States. State taxes differ, not only in the rate imposed but also in the categories of goods that are taxed and, sometimes, the relevant date of purchase. Eventually, software that is available at a reasonable cost may make it easier for small businesses to cope with these problems. Indeed, as the physical presence rule no longer controls, those systems may well become available in a short period of time, either from private providers or from state taxing agencies them-selves. And in all events, Congress may legislate to ad-dress these problems if it deems it necessary and fit to do so.

In this case, however, South Dakota affords small mer-chants a reasonable degree of protection. The law at issue requires a merchant to collect the tax only if it does a considerable amount of business in the State; the law is not retroactive; and South Dakota is a party to the Streamlined Sales and Use Tax Agreement, see *infra* at 23.

Finally, other aspects of the Court's Commerce Clause doctrine can protect against any undue burden on inter-state commerce, taking into consideration the small busi-nesses, startups, or others who engage in commerce across state lines. For example, the United States argues that tax-collection requirements should be analyzed under the balancing framework of *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137. Others have argued that retroactive liability risks a double tax burden in violation of the Court's appor-tionment jurisprudence because it would make both the buyer and the seller legally liable for collecting and remit-

ting the tax on a transaction intended to be taxed only once. See Brief for Law Professors et al. as *Amici Curiae* 7, n. 5. Complex state tax systems could have the effect of discriminating against interstate commerce. Concerns that complex state tax systems could be a burden on small business are answered in part by noting that, as discussed below, there are various plans already in place to simplify collection; and since in-state businesses pay the taxes as well, the risk of discrimination against out-of-state sellers is avoided. And, if some small businesses with only *de minimis* contacts seek relief from collection systems thought to be a burden, those entities may still do so under other theories. These issues are not before the Court in the instant case; but their potential to arise in some later case cannot justify retaining this artificial, anachronistic rule that deprives States of vast revenues from major businesses.

For these reasons, the Court concludes that the physical presence rule of *Quill* is unsound and incorrect. The Court's decisions in *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992), and *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967), should be, and now are, overruled.

V

In the absence of *Quill* and *Bellas Hess*, the first prong of the *Complete Auto* test simply asks whether the tax applies to an activity with a substantial nexus with the taxing State. 430 U. S., at 279. "[S]uch a nexus is established when the taxpayer [or collector] 'avails itself of the substantial privilege of carrying on business' in that jurisdiction." *Polar Tankers, Inc.* v. *City of Valdez*, 557 U. S. 1, 11 (2009).

Here, the nexus is clearly sufficient based on both the economic and virtual contacts respondents have with the State. The Act applies only to sellers that deliver more

than $100,000 of goods or services into South Dakota or engage in 200 or more separate transactions for the delivery of goods and services into the State on an annual basis. S. B. 106, §1. This quantity of business could not have occurred unless the seller availed itself of the substantial privilege of carrying on business in South Dakota. And respondents are large, national companies that undoubtedly maintain an extensive virtual presence. Thus, the substantial nexus requirement of *Complete Auto* is satisfied in this case.

The question remains whether some other principle in the Court's Commerce Clause doctrine might invalidate the Act. Because the *Quill* physical presence rule was an obvious barrier to the Act's validity, these issues have not yet been litigated or briefed, and so the Court need not resolve them here. That said, South Dakota's tax system includes several features that appear designed to prevent discrimination against or undue burdens upon interstate commerce. First, the Act applies a safe harbor to those who transact only limited business in South Dakota. Second, the Act ensures that no obligation to remit the sales tax may be applied retroactively. S. B. 106, §5. Third, South Dakota is one of more than 20 States that have adopted the Streamlined Sales and Use Tax Agreement. This system standardizes taxes to reduce administrative and compliance costs: It requires a single, state level tax administration, uniform definitions of products and services, simplified tax rate structures, and other uniform rules. It also provides sellers access to sales tax administration software paid for by the State. Sellers who choose to use such software are immune from audit liability. See App. 26–27. Any remaining claims regarding the application of the Commerce Clause in the absence of *Quill* and *Bellas Hess* may be addressed in the first instance on remand.

The judgment of the Supreme Court of South Dakota is

vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–494

_____

## SOUTH DAKOTA, PETITIONER *v.* WAYFAIR, INC., ET AL.

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF SOUTH DAKOTA

[June 21, 2018]

JUSTICE THOMAS, concurring.

Justice Byron White joined the majority opinion in *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967). Twenty-five years later, we had the opportunity to overrule *Bellas Hess* in *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992). Only Justice White voted to do so. See *id.*, at 322 (opinion concurring in part and dissenting in part). I should have joined his opinion. Today, I am slightly further removed from *Quill* than Justice White was from *Bellas Hess*. And like Justice White, a quarter century of experience has convinced me that *Bellas Hess* and *Quill* "can no longer be rationally justified." 504 U. S., at 333. The same is true for this Court's entire negative Commerce Clause jurisprudence. See *Comptroller of Treasury of Md.* v. *Wynne*, 575 U. S. \_\_\_, \_\_\_ (2015) (THOMAS, J., dissenting) (slip op., at 1). Although I adhered to that jurisprudence in *Quill*, it is never too late to "surrende[r] former views to a better considered position." *McGrath* v. *Kristensen*, 340 U. S. 162, 178 (1950) (Jackson, J., concurring). I therefore join the Court's opinion.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–494

_____

## SOUTH DAKOTA, PETITIONER *v.* WAYFAIR, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF SOUTH DAKOTA

[June 21, 2018 ]

JUSTICE GORSUCH, concurring.

Our dormant commerce cases usually prevent States from discriminating between in-state and out-of-state firms. *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967), and *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992), do just the opposite. For years they have enforced a judicially created tax break for out-of-state Internet and mail-order firms at the expense of in-state brick-and-mortar rivals. See *ante,* at 12–13; *Direct Marketing Assn.* v. *Brohl*, 814 F. 3d, 1129, 1150 (CA10 2016) (Gorsuch, J. concurring). As Justice White recognized 26 years ago, judges have no authority to construct a discriminatory "tax shelter" like this. *Quill, supra,* at 329 (opinion concurring in part and dissenting in part). The Court is right to correct the mistake and I am pleased to join its opinion.

My agreement with the Court's discussion of the history of our dormant commerce clause jurisprudence, however, should not be mistaken for agreement with all aspects of the doctrine. The Commerce Clause is found in Article I and authorizes *Congress* to regulate interstate commerce. Meanwhile our dormant commerce cases suggest Article III *courts* may invalidate state laws that offend no congressional statute. Whether and how much of this can be squared with the text of the Commerce Clause, justified by

*stare decisis*, or defended as misbranded products of federalism or antidiscrimination imperatives flowing from Article IV's Privileges and Immunities Clause are questions for another day. See *Energy & Environment Legal Inst.* v. *Epel*, 793 F. 3d 1169, 1171 (CA10 2015); *Comptroller of Treasury of Md.* v. *Wynne*, 575 U. S. ___, ___–___ (2015) (Scalia, J., dissenting) (slip op., at 1–3); *Camps Newfound/Owatonna, Inc.* v. *Town of Harrison*, 520 U. S. 564, 610–620 (1997) (THOMAS, J., dissenting). Today we put *Bellas Hess* and *Quill* to rest and rightly end the paradox of condemning interstate discrimination in the national economy while promoting it ourselves.

# SUPREME COURT OF THE UNITED STATES

_____

No. 17–494

_____

## SOUTH DAKOTA, PETITIONER *v.* WAYFAIR, INC., ET AL.

### ON WRIT OF CERTIORARI TO THE SUPREME COURT OF SOUTH DAKOTA

[June 21, 2018]

CHIEF JUSTICE ROBERTS, with whom JUSTICE BREYER, JUSTICE SOTOMAYOR, and JUSTICE KAGAN join, dissenting.

In *National Bellas Hess, Inc.* v. *Department of Revenue of Ill.*, 386 U. S. 753 (1967), this Court held that, under the dormant Commerce Clause, a State could not require retailers without a physical presence in that State to collect taxes on the sale of goods to its residents. A quarter century later, in *Quill Corp.* v. *North Dakota*, 504 U. S. 298 (1992), this Court was invited to overrule *Bellas Hess* but declined to do so. Another quarter century has passed, and another State now asks us to abandon the physical-presence rule. I would decline that invitation as well.

I agree that *Bellas Hess* was wrongly decided, for many of the reasons given by the Court. The Court argues in favor of overturning that decision because the "Internet's prevalence and power have changed the dynamics of the national economy." *Ante,* at 18. But that is the very reason I oppose discarding the physical-presence rule. E-commerce has grown into a significant and vibrant part of our national economy against the backdrop of established rules, including the physical-presence rule. Any alteration to those rules with the potential to disrupt the development of such a critical segment of the economy should be undertaken by Congress. The Court should not act on this important question of current economic policy, solely to

expiate a mistake it made over 50 years ago.

## I

This Court "does not overturn its precedents lightly." *Michigan* v. *Bay Mills Indian Community*, 572 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 15).  Departing from the doctrine of *stare decisis* is an "exceptional action" demanding "special justification."  *Arizona* v. *Rumsey*, 467 U. S. 203, 212 (1984).  The bar is even higher in fields in which Congress "exercises primary authority" and can, if it wishes, over-ride this Court's decisions with contrary legislation.  *Bay Mills*, 572 U. S., at \_\_\_ (slip op., at 16) (tribal sovereign immunity); see, *e.g., Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. \_\_\_, \_\_\_ (2015) (slip op., at 8) (statutory interpretation); *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. \_\_\_, \_\_\_ (2014) (slip op., at 12) (judicially created doctrine implementing a judicially created cause of action).  In such cases, we have said that "the burden borne by the party advocating the abandonment of an established precedent" is "greater" than usual.  *Patterson* v. *McLean Credit Union*, 491 U. S. 164, 172 (1989).  That is so "even where the error is a matter of serious concern, provided correction can be had by legislation."  *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U. S. 409, 424 (1986) (quoting *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406 (1932) (Brandeis, J., dissenting)).

We have applied this heightened form of *stare decisis* in the dormant Commerce Clause context.  Under our dormant Commerce Clause precedents, when Congress has not yet legislated on a matter of interstate commerce, it is the province of "the courts to formulate the rules." *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 770 (1945).  But because Congress "has plenary power to regulate commerce among the States," *Quill*, 504 U. S., at 305, it may at any time replace such judicial rules with legislation of its own, see *Prudential Ins. Co.* v. *Ben-*

*jamin*, 328 U. S. 408, 424–425 (1946).

In *Quill*, this Court emphasized that the decision to hew to the physical-presence rule on *stare decisis* grounds was "made easier by the fact that the underlying issue is not only one that Congress may be better qualified to resolve, but also one that Congress has the ultimate power to resolve." 504 U. S., at 318 (footnote omitted). Even assuming we had gone astray in *Bellas Hess*, the "very fact" of Congress's superior authority in this realm "g[a]ve us pause and counsel[ed] withholding our hand." *Quill*, 504 U. S., at 318 (alterations omitted). We postulated that "the better part of both wisdom and valor [may be] to respect the judgment of the other branches of the Government." *Id.,* at 319; see *id.,* at 320 (Scalia, J., concurring in part and concurring in judgment) (recognizing that *stare decisis* has "special force" in the dormant Commerce Clause context due to Congress's "final say over regulation of interstate commerce"). The Court thus left it to Congress "to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a duty to collect use taxes." *Id.,* at 318 (majority opinion).

## II

This is neither the first, nor the second, but the third time this Court has been asked whether a State may obligate sellers with no physical presence within its borders to collect tax on sales to residents. Whatever salience the adage "third time's a charm" has in daily life, it is a poor guide to Supreme Court decisionmaking. If *stare decisis* applied with special force in *Quill*, it should be an even greater impediment to overruling precedent now, particularly since this Court in *Quill* "tossed [the ball] into Congress's court, for acceptance or not as that branch elects." *Kimble*, 576 U. S., at \_\_\_ (slip op., at 8); see *Quill*, 504 U. S., at 318 ("Congress is now free to decide" the circumstances in which "the States may burden interstate

. . . concerns with a duty to collect use taxes").

Congress has in fact been considering whether to alter the rule established in *Bellas Hess* for some time. See Addendum to Brief for Four United States Senators as *Amici Curiae* 1–4 (compiling efforts by Congress between 2001 and 2017 to pass legislation respecting interstate sales tax collection); Brief for Rep. Bob Goodlatte et al. as *Amici Curiae* 20–23 (Goodlatte Brief) (same). Three bills addressing the issue are currently pending. See Marketplace Fairness Act of 2017, S. 976, 115th Cong., 1st Sess. (2017); Remote Transactions Parity Act of 2017, H. R. 2193, 115th Cong., 1st Sess. (2017); No Regulation Without Representation Act, H. R. 2887, 115th Cong., 1st Sess. (2017). Nothing in today's decision precludes Congress from continuing to seek a legislative solution. But by suddenly changing the ground rules, the Court may have waylaid Congress's consideration of the issue. Armed with today's decision, state officials can be expected to redirect their attention from working with Congress on a national solution, to securing new tax revenue from remote retailers. See, *e.g.,* Brief for Sen. Ted Cruz et al. as *Amici Curiae* 10–11 ("Overturning *Quill* would undo much of Congress' work to find a workable national compromise under the Commerce Clause.").

The Court proceeds with an inexplicable sense of urgency. It asserts that the passage of time is only increasing the need to take the extraordinary step of overruling *Bellas Hess* and *Quill*: "Each year, the physical presence rule becomes further removed from economic reality and results in significant revenue losses to the States." *Ante*, at 10. The factual predicates for that assertion include a Government Accountability Office (GAO) estimate that, under the physical-presence rule, States lose billions of dollars annually in sales tax revenue. See *ante*, at 2, 19 (citing GAO, Report to Congressional Requesters: Sales Taxes, States Could Gain Revenue from Expanded Au-

thority, but Businesses Are Likely to Experience Compliance Costs 5 (GAO–18–114, Nov. 2017) (Sales Taxes Report)). But evidence in the same GAO report indicates that the pendulum is swinging in the opposite direction, and has been for some time. States and local governments are already able to collect approximately 80 percent of the tax revenue that would be available if there were no physical-presence rule. See Sales Taxes Report 8. Among the top 100 Internet retailers that rate is between 87 and 96 percent. See *id.,* at 41. Some companies, including the online behemoth Amazon,\* now voluntarily collect and remit sales tax in every State that assesses one—even those in which they have no physical presence. See *id.,* at 10. To the extent the physical-presence rule is harming States, the harm is apparently receding with time.

The Court rests its decision to overrule *Bellas Hess* on the "present realities of the interstate marketplace." *Ante,* at 18. As the Court puts it, allowing remote sellers to escape remitting a lawful tax is "unfair and unjust." *Ante,* at 16. "[U]nfair and unjust to . . . competitors . . . who must remit the tax; to the consumers who pay the tax; and to the States that seek fair enforcement of the sales tax." *Ante,* at 16. But "the present realities of the interstate marketplace" include the possibility that the marketplace itself could be affected by abandoning the physical-presence rule. The Court's focus on unfairness and injustice does not appear to embrace consideration of that current public policy concern.

The Court, for example, breezily disregards the costs that its decision will impose on retailers. Correctly calculating and remitting sales taxes on all e-commerce sales

---

\*C. Isidore, Amazon To Start Collecting State Sales Taxes Everywhere (Mar. 29, 2017), CNN Tech, http://money.cnn.com/2017/03/29/technology/amazon-sales-tax/index.html (all Internet materials as last visited June 19, 2018).

will likely prove baffling for many retailers. Over 10,000 jurisdictions levy sales taxes, each with "different tax rates, different rules governing tax-exempt goods and services, different product category definitions, and different standards for determining whether an out-of-state seller has a substantial presence" in the jurisdiction. Sales Taxes Report 3. A few examples: New Jersey knitters pay sales tax on yarn purchased for art projects, but not on yarn earmarked for sweaters. See Brief for eBay, Inc., et al. as *Amici Curiae* 8, n. 3 (eBay Brief). Texas taxes sales of plain deodorant at 6.25 percent but imposes no tax on deodorant with antiperspirant. See *id.*, at 7. Illinois categorizes Twix and Snickers bars—chocolate-and-caramel confections usually displayed side-by-side in the candy aisle—as food and candy, respectively (Twix have flour; Snickers don't), and taxes them differently. See *id.,* at 8; Brief for Etsy, Inc., as *Amicus Curiae* 14–17 (Etsy Brief) (providing additional illustrations).

The burden will fall disproportionately on small businesses. One vitalizing effect of the Internet has been connecting small, even "micro" businesses to potential buyers across the Nation. People starting a business selling their embroidered pillowcases or carved decoys can offer their wares throughout the country—but probably not if they have to figure out the tax due on every sale. See Sales Taxes Report 22 (indicating that "costs will likely increase the most for businesses that do not have established legal teams, software systems, or outside counsel to assist with compliance related questions"). And the software said to facilitate compliance is still in its infancy, and its capabilities and expense are subject to debate. See Etsy Brief 17–19 (describing the inadequacies of such software); eBay Brief 8–12 (same); Sales Taxes Report 16–20 (concluding that businesses will incur "high" compliance costs). The Court's decision today will surely have the effect of dampening opportunities for commerce

in a broad range of new markets.

A good reason to leave these matters to Congress is that legislators may more directly consider the competing interests at stake. Unlike this Court, Congress has the flexibility to address these questions in a wide variety of ways. As we have said in other dormant Commerce Clause cases, Congress "has the capacity to investigate and analyze facts beyond anything the Judiciary could match." *General Motors Corp.* v. *Tracy*, 519 U. S. 278, 309 (1997); see *Department of Revenue of Ky.* v. *Davis*, 553 U. S. 328, 356 (2008).

Here, after investigation, Congress could reasonably decide that current trends might sufficiently expand tax revenues, obviating the need for an abrupt policy shift with potentially adverse consequences for e-commerce. Or Congress might decide that the benefits of allowing States to secure additional tax revenue outweigh any foreseeable harm to e-commerce. Or Congress might elect to accommodate these competing interests, by, for example, allowing States to tax Internet sales by remote retailers only if revenue from such sales exceeds some set amount per year. See Goodlatte Brief 12–14 (providing varied examples of how Congress could address sales tax collection). In any event, Congress can focus directly on current policy concerns rather than past legal mistakes. Congress can also provide a nuanced answer to the troubling question whether any change will have retroactive effect.

An erroneous decision from this Court may well have been an unintended factor contributing to the growth of e-commerce. See, *e.g.,* W. Taylor, Who's Writing the Book on Web Business? Fast Company (Oct. 31, 1996), https://www.fastcompany.com/27309/whos-writing-book-web-business. The Court is of course correct that the Nation's economy has changed dramatically since the time that *Bellas Hess* and *Quill* roamed the earth. I fear the Court today is compounding its past error by trying to fix

it in a totally different era. The Constitution gives Congress the power "[t]o regulate Commerce . . . among the several States." Art. I, §8. I would let Congress decide whether to depart from the physical-presence rule that has governed this area for half a century.

I respectfully dissent.