IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
May 23, 2018 Session

## POPULARCATEGORIES.COM, INC. v. DAVID GERREGANO, COMMISSIONER OF REVENUE, STATE OF TENNESSEE

**Appeal from the Chancery Court for Davidson County**
**No. 09-781-I Claudia Bonnyman, Chancellor**

_____

**No. M2017-01382-COA-R3-CV**

_____

This appeal involves the Appellant's liability for franchise and excise taxes assessed against it by the Tennessee Department of Revenue. The trial court determined that the Appellant's incorporation in the State of Florida did not afford it the right to apportionment for tax purposes, and entered a judgment against it in an amount over $2,000,000.00. The trial court also determined that the Commissioner of Revenue was entitled to an award of attorneys' fees and litigation expenses as the prevailing party under Tennessee Code Annotated section 67-1-1803(d). For the reasons stated herein, we reverse the trial court's ruling on apportionment, vacate the monetary judgment and award of attorneys' fees, and remand for further proceedings consistent with this Opinion.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Reversed in Part, Vacated in Part and Remanded

ARNOLD B. GOLDIN, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, P.J., W.S., and KENNY ARMSTRONG, J., joined.

Charles A. Trost, G. Michael Yopp, and Christopher A. Wilson, Nashville, Tennessee, and John A. Lucas, Knoxville, Tennessee for the appellant, PopularCategories.Com,Inc.

Herbert H. Slatery III, Attorney General and Reporter, Andrée Sophia Blumstein, Solicitor General, and Mary Ellen Knack, Senior Counsel, for the appellee, David Gerregano,[1] Commissioner of Revenue, State of Tennessee.

_____

[1] In accordance with Tenn. R. App. P. 19(c), David Gerregano, the current Commissioner of Revenue, has been substituted for his predecessors.

**OPINION**

**BACKGROUND AND PROCEDURAL HISTORY[2]**

The Appellant, popularcategories.com, Inc. ("Popular Categories"), was incorporated under the laws of the State of Florida in October of 2000. The corporation was originally formed by Blake Bookstaff and William Marquez for the operational purpose of reserving domain names and receiving income from advertising conducted thereon. Although Popular Categories filed a Florida tax return and paid Florida tax for the 2000 tax year, it elected Subchapter S status for federal tax purposes effective January 1, 2001. It is undisputed that this election resulted in Popular Categories owing no Florida tax liability. On its 2001 Florida return, Popular Categories reported its federal taxable income as "0" and showed its tax due as "0," and its 2002 Florida intangible property tax return also showed no liability for the corporation. Popular Categories did not file any further tax returns in Florida, nor did it file any tax returns in Tennessee.[3]

In March 2001, Popular Categories and Compatible Technologies of Orlando ("Compatible Technologies") formed Popular Enterprises, LLC ("Popular Enterprises"), a Florida limited liability company. Both Popular Categories and Compatible Technologies transferred their respective domain names to the newly-formed entity. Whereas Popular Categories received a two-thirds member interest in Popular Enterprises, Compatible Technologies received a one-third interest. After the transfer of its domain names to Popular Enterprises, Popular Categories ceased its direct operations as a domain name aggregator. From 2002 forward, Popular Categories engaged in the business of monitoring its investment in Popular Enterprises.

When Popular Categories failed to file its 2002 Florida annual report, the Florida Secretary of State administratively dissolved its charter. By the time that Popular Categories filed to have its charter reinstated in February 2006, its report indicated that its officers were Mr. Bookstaff, President, and John Brook, Secretary. This report also showed that Popular Categories' principal office address was in Knoxville, Tennessee.

The present controversy, which concerns tax assessments issued to Popular Categories by the Tennessee Department of Revenue, arose out of Popular Categories' perceived presence in this state. It is undisputed that the accounting and administrative activities of both Popular Categories and Popular Enterprises were conducted in

---

[2] As the substantive tax liability questions at issue in this case were resolved at the summary judgment stage of litigation, our overview of the precipitating facts in this matter derives in large part from those facts which were undisputed for purposes of ruling on the parties' respective motions for summary judgment.

[3] At summary judgment, Popular Categories argued that it did not file any returns in Tennessee because it allegedly "was not doing business" there.

Tennessee, and on its federal corporate tax returns for the years 2000 through 2007, Popular Categories showed its office address as Knoxville, Tennessee.

Although Mr. Bookstaff and Mr. Marquez each originally held 100 shares in Popular Categories, Mr. Bookstaff eventually became the sole shareholder effective January 26, 2005. While Mr. Marquez entered into an agreement with Popular Categories to provide consulting services and serve as an officer, the agreement was terminated in August 2005. Subsequently, in February 2006, Popular Categories' member interest in Popular Enterprises was sold to Internet REIT following a number of solicitation efforts.

In 2008, the Tennessee Department of Revenue ("the Department") conducted an audit of Popular Categories after learning of its business activity in Tennessee from an audit of Popular Enterprises. The Department determined that Popular Categories was doing business in Tennessee and was, therefore, subject to Tennessee franchise and excise taxes in the 2006 and 2007 tax years. The Department further determined that Popular Categories was not doing business outside of Tennessee and thus not entitled to apportion its net earnings and net worth. As a result of the audit and the Department's awareness that Popular Categories had received payments stemming from the sale of its membership interest in Popular Enterprises, tax assessments subsequently issued.[4]

Regarding the 2006 tax year, the Department issued a notice of assessment on June 6, 2008 in the amount of $899,288.78. This consisted of franchise and excise taxes of $642,694.77, penalty of $160,673.69, and interest of $95,920.32. Although Popular Categories requested an informal conference, a hearing officer issued a letter upholding the assessment on January 22, 2009. Regarding the 2007 tax year, the Department issued a notice of assessment on February 14, 2009 in the amount of $630,515.23. This consisted of franchise and excise taxes of $473,341.00, penalty of $118,335.00, and interest of $38,839.23. Although Popular Categories again requested an informal conference, the assessment was not altered; on July 30, 2009, a hearing officer issued a letter upholding the assessment.

Litigation ensued when Popular Categories filed complaints against the Commissioner of Revenue ("the Commissioner") challenging the above assessments pursuant to Tennessee Code Annotated section 67-1-1801. *See* Tenn. Code Ann. § 67-1-1801(a)(1)(B) (2013) (providing that "[t]he taxpayer may file suit against the commissioner in chancery court in the appropriate county in this state, challenging all or any portion of the assessment of such tax").[5] The first complaint, filed in the Davidson

---

[4] As would later be evidenced by letters upholding the assessments, the Department had determined that the proceeds from the sale of Popular Categories' interest in Popular Enterprises constituted "business earnings."

[5] Pursuant to a 2014 amendment, effective January 1, 2015, the phrase "the final assessment" was substituted for "the assessment" in the cited provision. *See* Tenn. Code Ann. § 67-1-1801(a)(1)(B) (Supp.

County Chancery Court in April 2009, challenged the tax assessment for the 2006 tax year. The second complaint, filed in the Davidson County Chancery Court in October 2009, challenged the tax assessment for the 2007 tax year. Both complaints alleged that Popular Categories was entitled to apportion its net worth and net earnings due to its engagement in "multi-state business." In July 2010, after the Commissioner had filed answers to Popular Categories' complaints and asserted counterclaims seeking judgments for the amounts of the Department's assessments, the trial court entered an order consolidating the separate actions.

On February 23, 2014, the Commissioner filed a motion for partial summary judgment regarding the counts in Popular Categories' complaints that specifically dealt with the claimed right to apportionment. According to the Commissioner, the Department had correctly determined that Popular Categories was "not entitled to apportion." Popular Categories disagreed and later filed a counter-motion for partial summary judgment, arguing that it was entitled to apportionment. In support of its position, Popular Categories maintained that it had contacts with other states which would subject [it] to franchise and excise taxation, if such contacts were conducted within Tennessee. Further, it alleged that it had the "right to apportion due to the formation of a multi-state partnership between [Popular Categories] and Internet REIT in 2006." According to Popular Categories, the claimed partnership resulted from an "earnout" provision included in the Membership Interest Purchase Agreement accompanying the sale of its interest in Popular Enterprises to Internet REIT.

The cross-motions for partial summary judgment were heard by the trial court on August 8, 2014, and it took the matter under advisement at the conclusion of the hearing. Several months later, on April 8, 2015, the parties returned to the trial court, and an oral ruling was delivered granting partial summary judgment in favor of the Commissioner. This oral ruling was, thereafter, incorporated into a written order entered by the trial court on May 11, 2015. In addressing the issues raised by the parties' cross-motions for partial summary judgment, the May 11 order concluded in pertinent part as follows:

1. The Plaintiff was not entitled to apportionment for franchise and excise tax purposes during the tax years 2006 and 2007 because the Plaintiff was doing business in Tennessee and was not doing business in any other state during those years.
2. The Plaintiff was not entitled to apportionment merely because it was incorporated in Florida.
3. The Tennessee franchise and excise tax statutes regarding apportionment, both as written and applied, meet the Due Process and

2018) ("The taxpayer may file suit against the commissioner in chancery court in the appropriate county in this state, challenging all or any portion of the final assessment of such tax[.]").

Commerce Clause requirements of the United States Constitution and are constitutional.

4. The Plaintiff is not entitled to apportionment based on its claim under the earnout provision in the Sales Agreement because that agreement did not create a partnership under Tennessee law.

Following the trial court's resolution of the asserted apportionment issues, the issue of Popular Categories' ultimate tax liability began to be actively litigated. On November 18, 2016, the Commissioner moved for final summary judgment, contending that there was no genuine issue of material fact as to the tax amounts owed to the Commissioner relative to the 2006 and 2007 tax years. The motion was supported, in part, by the affidavit of tax audit supervisor Terri McAllister, wherein Ms. McAllister attested that Popular Categories' franchise and excise tax liability totaled over $2,000,000.00, including interest.

The Commissioner's request for summary judgment did not go unchallenged. On December 29, 2016, Popular Categories filed a motion to strike Ms. McAllister's affidavit, and on January 9, 2017, it filed a brief in opposition to the Commissioner's motion for final summary judgment. These matters were eventually addressed by the trial court in an order entered on March 22, 2017. Pursuant to that order, the trial court not only denied Popular Categories' motion to strike Ms. McAllister's affidavit, but also held that the Commissioner's summary judgment materials demonstrated that he was entitled to a judgment "in the amount of $2,107,691.54." According to the trial court, this amount included the taxes, penalties, and interest that had accrued as of the end of the previous year.

The trial court's order, however, did not adjudicate every issue in the case. The trial court held that the determination of attorneys' fees and expenses under Tennessee Code Annotated section 67-1-1803(d) should await the outcome of any appeal, and accordingly, it certified its judgment as final pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. Popular Categories thereafter filed a motion to alter or amend, which motion was denied, leading to the initiation of the present appeal.

Upon our initial review of the record on appeal, we *sua sponte* raised the question of whether subject matter jurisdiction existed in light of the unresolved issue of attorneys' fees. Although the parties represented that tax cases such as this are typically certified as final in the manner employed by the trial court, we questioned the validity of such practice. In a per curiam order entered May 29, 2018, we concluded that, because the matter "certified as final . . . is inextricably linked with the unresolved issue of attorneys' fees and expenses," the Rule 54.02 certification was improvidently granted. Instead of dismissing the appeal outright, our May 29 order allowed the parties an opportunity to obtain a final judgment. On July 6, 2018, the trial court entered a "Final Judgment" and awarded the Commissioner "a judgment for his attorneys' fees and litigation expenses in

the amount of $237,976.44." Because a final judgment has now been entered, we proceed to review the issues raised in this appeal.

## ISSUES PRESENTED

As to the substantive tax issues surrounding this case, Popular Categories raises three primary issues in its principal appellate brief, which we have rephrased as follows:

1. Whether the trial court erred in granting the Commissioner partial summary judgment by denying Popular Categories the right to apportionment.
2. Whether the trial court erred in not striking the affidavit of Terri McAllister submitted by the Commissioner in support of his final motion for summary judgment.
3. Whether the trial court erroneously granted summary judgment in the Commissioner's favor regarding the amount of tax and interest at issue.

As to the matter of attorneys' fees, Popular Categories also raises the following two issues in this appeal:

1. Whether the trial court erroneously ruled that the Commissioner constituted a prevailing party entitled to an award of attorneys' fees and expenses under Tennessee Code Annotated section 67-1-1803(d).
2. Whether the Commissioner's attorneys' fees and expenses were reasonable.

## STANDARD OF REVIEW

At issue in this appeal is the trial court's resolution of matters following requests for summary judgment. A motion for summary judgment should be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Tenn. R. Civ. P. 56.04. Ultimately, the moving party has the "burden of persuading the court that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 83 (Tenn. 2008) (citation omitted). Because the resolution of a motion for summary judgment involves a question of law, we review the trial court's disposition on the issue de novo without a presumption of correctness. *Id.* at 84 (citation omitted).

## DISCUSSION

We begin our discussion by focusing on perhaps the most contentious issue on appeal: whether Popular Categories is entitled to apportion its tax liability for the 2006

and 2007 tax years. The trial court answered this question in the negative. As discussed below, we are of the opinion that the trial court's holding on this issue was in error.

The taxes at issue in this case, Tennessee's franchise and excise taxes, are imposed upon corporations for the privilege of doing business in the state. *BellSouth Adver. & Publ'g Corp. v. Chumley*, 308 S.W.3d 350, 352 (Tenn. Ct. App. 2009) (citations omitted). "The excise tax is based on the taxpayer's 'net earnings,' while the franchise tax is based on the taxpayer's 'net worth.'" *Vodafone Americas Holdings, Inc. & Subsidiaries v. Roberts*, 486 S.W.3d 496, 514 (Tenn. 2016) (citations omitted). Nevertheless, the taxes have "been consistently construed together as one coordinate scheme of taxation." *First Am. Nat'l Bank of Knoxville v. Olsen*, 751 S.W.2d 417, 421 (Tenn. 1987) (citation omitted).

With respect to franchise and excise taxation in this state, apportionment is permitted pursuant to the following statutory provisions:

(a) Any taxpayer having business activities that are taxable both inside and outside the state of Tennessee shall allocate or apportion its net earnings or losses as provided in this part. A taxpayer is considered taxable in another state only if the taxpayer is conducting activities in that state that, if conducted in Tennessee, would constitute doing business in Tennessee and would subject the taxpayer to either Tennessee's franchise tax or excise tax.

Tenn. Code Ann. § 67-4-2010.

(a) Any taxpayer having business activities that are taxable both inside and outside the state of Tennessee shall allocate or apportion its net worth as provided in this part. A taxpayer is considered taxable in another state only if the taxpayer is conducting activities in that state that, if conducted in Tennessee, would constitute doing business in Tennessee and would subject the taxpayer to either Tennessee's franchise tax or excise tax.

Tenn. Code Ann. § 67-4-2110.

As both parties acknowledge, doing business in this state means "any activity purposefully engaged in within Tennessee, by a person with the object of gain, benefit, or advantage, consistent with the intent of the general assembly to subject such persons to the Tennessee franchise/excise tax to the extent permitted by the United States Constitution and the Constitution of Tennessee." *See* Tenn. Code Ann. § 67-4-2004(14)(A).[6]

---

[6] This citation references the definition's numbering and placement within the current version of the Code.

In this case, Popular Categories maintains that it is entitled to apportionment based on its incorporation in Florida and its activities in other states. The denial of its right to apportionment, it argues, unconstitutionally subjects it to the risk of multiple taxation. In furtherance of its position that it is entitled to apportionment, Popular Categories assails the trial court for concluding that "the business activities required for apportionment are greater than the contacts necessary to obtain nexus for jurisdiction purposes." Although we ultimately agree with Popular Categories that it is entitled to apportionment, we find its concern in this particular respect to be misguided.

The Commerce and Due Process Clauses "each pose distinct limits on the taxing power of the States." *J.C. Penney Nat'l Bank v. Johnson*, 19 S.W.3d 831, 836 (Tenn. Ct. App. 1999) (citation omitted). "The due process analysis in the area of state taxation of interstate commerce derives from the rules for *in personam* jurisdiction." *Id.* (citation omitted). At a basic level, the Due Process Clause "requires some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax." *Miller Bros. Co. v. State of Md.*, 347 U.S. 340, 344-45 (1954). The connection required under the Commerce Clause between a taxpayer and state is not the same as the minimum contacts under the Due Process Clause, as the Commerce Clause imposes a "greater limitation" on the right to tax. *J.C. Penney Nat'l Bank*, 19 S.W.3d at 838 (citation omitted). Indeed, "a tax may be consistent with the Due Process Clause but be prohibited under the Commerce Clause." *Scholastic Book Clubs, Inc. v. Farr*, 373 S.W.3d 558, 563 (Tenn. Ct. App. 2012) (citation omitted). Although Popular Categories criticizes the trial court for concluding that the "activities required for apportionment are greater than the contacts necessary to obtain nexus for jurisdiction purposes," the trial court's conclusion is consistent with the understanding in the law that the Commerce Clause imposes a greater limitation on the right to tax than does the Due Process Clause. Although we have no quarrel with Popular Categories' characterization of the "doing business" definition as a broad one, the engraftment of a constitutional standard into the definition reveals that, insofar as the Commerce Clause is concerned, the power to tax requires more than a minimum connection. In order for a taxpayer's connection to a state to subject that taxpayer to taxation, the dictates of the Commerce Clause must necessarily be satisfied.

Although the Commerce Clause expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. 1, § 8, cl. 3, the United States Supreme Court has "consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995) (citations omitted). The negative implication under the dormant Commerce Clause is that the states may not act to interfere with interstate commerce. *J.C. Penney Nat'l Bank*, 19 S.W.3d at 838. The contemporary understanding of what is demanded by the Commerce Clause largely stems from the United States Supreme Court's decision in *Complete Auto Transit, Inc. v. Brady*.

*See Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977).  Under the standard established in that opinion, a state tax will sustain a Commerce Clause challenge when the tax "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Id.* at 279.  In this case, the looming question is whether Popular Categories had a "substantial nexus" with some other state such that it would be *at risk* of taxation in that jurisdiction consistent with the demands of the Commerce Clause.  Unlike the Due Process clause's "minimum contacts" requirement, which is a proxy for notice, the "substantial nexus" requirement is a "means for limiting state burdens on interstate commerce." *Quill Corp. v. North Dakota By and Through Heitkamp*, 504 U.S. 298, 313 (1992), *overruled on other grounds by South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080 (2018).

As indicated earlier, Popular Categories contends that it is entitled to apportion its tax liability as a result of its connections to Florida and other states.  Notwithstanding our conclusion that Popular Categories' connections to Florida establishes its right to apportionment, which we will detail shortly, we do not find merit in several of its arguments.

According to Popular Categories, it is entitled to apportion its liability, in part, because of alleged undisputed facts regarding its travel to states such as California and New York.  With regard to the corporate travel activities engaged in by Popular Categories, we observe that they largely involved isolated solicitation efforts and, in any event, these cited contacts with non-Tennessee states, with one principal exception, occurred before the tax years in question.  Although it is true that one "out-of-state" visit took place in Telluride, Colorado during the 2006 tax year, the event relied upon consisted of Popular Categories signing paperwork related to the sale of its interest in Popular Enterprises while Mr. Bookstaff  was in Colorado for a ski trip.  We conclude that none of the cited travel activities by Popular Categories establishes a "substantial nexus" with another taxing jurisdiction during the tax years at issue.

Notwithstanding this conclusion, Popular Categories argues that even if its undisputed contacts with other states do not entitle it to apportionment, a number of disputed issues material to the question of apportionment remain to be resolved.  It is true that a number of facts proffered pursuant to Rule 56 of the Tennessee Rules of Civil Procedure remained in dispute at the summary judgment stage. For example, in one response to Popular Categories' statement of undisputed material facts, the Commissioner disputed the assertion that one "Vincent Claude was responsible for all technical operations at Popular Enterprises . . . and would do work from his computers in Florida."  However, on appeal, the Commissioner has argued that this proffered fact and other "so-called 'disputed' facts either are not really disputed or are not material to the issue [of] whether [Popular Categories] was doing business in any state besides

Tennessee." For instance, with regard to the aforementioned fact concerning Vincent Claude, the Commissioner argues as follows in his brief:

> The Commissioner does not dispute that Vincent Claude, an owner and officer of Compatible Technologies, was involved in the technical operations of Popular Enterprises (but not the Plaintiff) and sometimes used his computers in Florida to access information. As a matter of law, however, these activities cannot be attributed to the Plaintiff. Claude was not an owner or officer of the Plaintiff, and he did not purport to act on behalf of the Plaintiff. Moreover, the activities cited by the Plaintiff occurred in 2004, well before the tax years at issue.

(internal citations from brief omitted).

In addition to agreeing with the Commissioner's argument on this point, we conclude that certain other additional facts cited by Popular Categories are unavailing and simply do not establish that it had a "substantial nexus" to another jurisdiction in the applicable tax years. In addition to the travel activities mentioned earlier, Popular Categories has cited to certain travel activities by Mr. Bookstaff in 2006 to support its claim for apportionment. Although the Commissioner admits in his appellate brief that such travel occurred, he notes that Mr. Bookstaff's travel outside of Tennessee was pursuant to a consulting agreement that he had *individually* with Internet REIT. As a result of this fact, the Commissioner reasons that such travel contacts are insufficient to show that *Popular Categories* was doing business outside of Tennessee. We agree with the Commissioner that the personal travel activities taken by Mr. Bookstaff concerning his consulting agreement should not be attributed to Popular Categories. As such, we conclude that this does not show a substantial nexus with another jurisdiction in the relevant tax years.[7]

Popular Categories further argues on appeal that it is entitled to apportionment because of an alleged multi-state partnership between it and Internet REIT. As we understand its argument, a state may assert taxing nexus over a taxpayer who has a partnership interest in a partnership with state taxing nexus. Here, Internet REIT allegedly established out-of-state nexus for the claimed partnership through multiple activities outside of Tennessee. According to Popular Categories, a partnership with Internet REIT resulted from an "earnout" provision included in the agreement that accompanied the sale of its interest in Popular Enterprises. Specifically, Popular Categories claims that a partnership resulted, "as the term . . . is defined by Tenn. Code

---

[7] Given our agreement with the Commissioner that Mr. Bookstaff's actions with regard to the consulting agreement should not be attributed to Popular Categories, we need not opine on whether the character of his consulting travel would create a substantial nexus in the event it were somehow attributable to Popular Categories.

Ann. § 61-1-202, because the earnout provision granted [it] an ownership interest in a share of Popular Enterprises' profits."

The "earnout" provision in question provided, in part, that "Buyer shall pay to Sellers an amount . . . in proportion to the excess, if any, the Net Revenue for the assets owned by the Acquired Companies as of the Closing Date . . . during the fiscal year ending on December 31, 2006 . . . exceeds $8,900,000 . . . up to a maximum Net Revenue of $11,250,000." This calculated earnout payment, which was outlined in Section 2.4 of the Membership Interest Purchase Agreement, formed part of the "total consideration for the Membership Interests," which was detailed in Section 2.3 of the purchase agreement.

In rejecting Popular Categories' argument that the "earnout" provision legally created a partnership, the trial court held as follows in its order on the parties' cross-motions for summary judgment:[8]

> [T]he Taxpayer argues that TCA 61-1-202 defines partnership to include an ownership interest in a share of profits.
>
> . . . .
>
> While profit sharing may be an indication of a partnership, it is not a bright line rule. In this case, the Taxpayer's earnout provision does not amount to profit sharing. The Taxpayer . . . points to TCA Section 61-202[(a)] which states that a partnership is when two persons carry on as co-owners of a business and subsection c(3) states a person who receives a share of the profits is presumed a partner[.]
>
> . . . .
>
> [T]he taxpayer does not cite to the later portion of Section 61-1-202(c)(3) which states . . . profit sharing results . . . unless the profits were received in payment . . . [o]f a debt by installments or otherwise[.] . . . [C]lose examination of the earnout provision issue reveals that the last portion of remuneration to be paid to the taxpayer from the sale was payment of debt by installments. The earnout provision merely determined the amount of debt to be paid. It did not establish profit sharing.
>
> Accordingly, there was no presumption of a partnership, rather there is the absence of any written document describing the partnership or joint venture and there is testimony from Mr. Bookstaff that there was no

---

[8] The cited holding comes from the trial court's oral bench ruling, which was incorporated by reference into the trial court's May 11, 2015 order.

partnership. There is no evidence of any books or records kept concerning a partnership, and significantly, no federal partnership tax returns were filed[.]

We agree with the trial court that no partnership legally resulted from the earnout provision. That provision was directed at calculating part of the consideration owed under the Membership Interest Purchase Agreement. Therefore, even assuming this calculation was considered to involve a sharing of "profits," no presumption of a partnership between Internet REIT and Popular Categories legally arises. *See* Tenn. Code Ann. § 61-1-202(c)(3) (providing that a person who receives a share of profits should not be presumed to be a partner when the profits were received in payment "[o]f a debt by installments or otherwise" or "[f]or the sale of the goodwill of a business or other property by installments or otherwise").

Having addressed the foregoing arguments offered by Popular Categories in support of its claim for apportionment, we now turn to its connections to Florida. At the outset, we note that Popular Categories' very existence is grounded in Florida. Indeed, as mentioned earlier, it was incorporated under the laws of Florida in the fall of 2000. Popular Categories contends that this fact alone establishes a substantial nexus with Florida such that Florida could constitutionally impose its taxing jurisdiction. Popular Categories also argues that, beyond mere incorporation, there are other connections to Florida. For example, in addition to noting that it had designated a Florida agent for accepting service of process, Popular Categories details that it maintained a bank account in Florida, that it facilitated transactions from that account, and that the proceeds from the sale of its membership interest in Popular Enterprises were deposited there. Although the debate over these connections appears to be limited to their legal significance,[9] there also appears to be a factual dispute regarding another alleged connection to Florida, namely whether Popular Categories maintained a corporate office in Florida during a portion of the 2006 tax year. At summary judgment, the Commissioner disputed the assertion that an office was maintained in Florida in 2006, and in his brief on appeal, he submits that "the record contains no evidence that the Plaintiff still maintained a corporate office in Florida during the 2006 or 2007 tax years." A careful review of the record, however, belies the Commissioner's claim that no such evidence can be found. Indeed, an affidavit exists in the record in which Mr. Bookstaff attests to the fact that Popular Categories maintained a corporate office in Florida during a portion of the 2006 tax year.[10]

---

[9] We would note again that, as with certain other proffered facts, the Commissioner disputed certain connections to Florida at the summary judgment stage of litigation, although ultimately acknowledging them (and dismissing their materiality) on appeal. For instance, although the Commissioner previously disputed the assertion that Popular Categories received the proceeds from the sale of its membership interest in Popular Enterprises in its Florida bank account, he expressly stated in his appellate brief that he "does not dispute . . . that funds from the sale . . . were deposited into that account."

[10] Without a doubt, there is evidence in the record that, at least on the surface, raises questions

Although this specific factual issue appears to remain an open one, we are of the opinion that a conclusion concerning Popular Categories' right to apportionment is not dependent on its resolution. In our view, the undisputed connection to Florida, namely Popular Categories' incorporation in the state, affords a substantial nexus for purposes of taxation.

The fact that Popular Categories was incorporated in Florida is not without significance. After all, its corporate life and existence was owed to the state. *See State Tax Comm'n of Utah v. Aldrich*, 316 U.S. 174, 180 (1942) ("The corporation owes its existence to Utah. Utah law defines the nature and extent of the interest of the shareholders in the corporation. Utah law affords protection for those rights."). In our opinion, Popular Categories' legal domicile in Florida necessarily affords it a substantial nexus such that it is subject to Florida's taxing jurisdiction. A residence-grounded basis for a state's taxing jurisdiction is well-settled. As one commentator has observed:

> With regard to residence, the Supreme Court has observed "that the receipt of income by a resident of the territory of a taxing sovereignty is a taxable event is universally recognized. Domicil itself affords a basis for such taxation." Accordingly, "as to residents a state may, and does, exert its taxing power over their income from all sources, whether within or without the state . . . ." The rationale for allowing states to tax residents upon their income without regard to source, a rationale that courts have applied to corporate as well as to individual residents, is "founded upon the protection afforded to the recipient of the income by the state, in his person, in his right to receive the income, and in his enjoyment of it when received" as well as his "enjoyment of privileges of residence in the state and the attendant right to invoke the protection of its laws . . . ." Indeed, it is the residence principle of taxation that underlies the United States' undisputed power to tax its resident individuals and corporations (that is, domestic corporations) on all of their income regardless of source.

Walter Hellerstein, *State Taxation of Corporate Income from Intangibles: Allied-Signal and Beyond*, 48 Tax L. Rev. 739, 809-10 (1993) (internal footnotes omitted).

Moreover, as another commentator has noted regarding franchise taxation:

---

surrounding Mr. Bookstaff's assertion. For example, the address for the putative office in the 2006 tax year corresponds to the residence of Mr. Marquez, and it is undisputed that, although Mr. Marquez had entered into an agreement with Popular Categories to provide consulting services and serve as an officer, the agreement was terminated in August 2005. We will refrain from trying to speculate whether any coherence or harmony can be found among these facts and Mr. Bookstaff's assertion. As it is, there is simply a technical dispute as to whether an office was maintained in Florida for a portion of the 2006 tax year. Of course, as we have noted elsewhere, we are of the opinion that Popular Categories' undisputed connections to Florida establish a right to apportionment regardless of whether an office was maintained in Florida in 2006.

[T]he power of the State to impose franchise taxes for the privilege of being incorporated within the State is well settled. The State has power to tax a domestic corporation for the privilege of being a corporation, and such a tax does not necessarily run afoul of the commerce clause because measured by the total capital stock, although the corporation engages in interstate commerce.

Charles A. Trost, Federal Limitations on State and Local Taxation § 12:4.

It is unnecessary to speculate in this appeal, the extent to which some hypothetical Florida taxation scheme could have survived constitutional muster. Our inquiry is essentially limited to the blanket question of whether Popular Categories was subject to Florida's taxing jurisdiction. We do not, however, altogether dismiss the Commissioner's articulated concern over whether Florida would have been able to tax all of Popular Categories' income. Notwithstanding some authorities suggesting to the contrary, "modern opinions sustain[] a state's right to tax an apportioned share of a nondomiciliary corporation's income or property while rejecting the claim that the state of the corporation's domicile had the exclusive power to tax all such income or property." Walter Hellerstein, *Is 'Internal Consistency' Foolish?: Reflections on an Emerging Commerce Clause Restraint on State Taxation*, 87 Mich. L. Rev. 138, 163 n.136 (1988). Although this concern, which is grounded in the Commerce Clause, may rightfully restrict the extent to which Florida may exercise its taxing jurisdiction as a result of Popular Categories' connections to other states, such a restriction does not mean that a substantial nexus or taxing jurisdiction is absent in Florida. As some commentators have opined:

We believe that a state claiming to tax on the basis of residence may satisfy its obligation to accommodate its taxing rights to the state with the stronger claim to tax the same value by providing a credit for any tax imposed by the latter and does not have to refrain from taxing altogether. In other words, we believe the Commerce Clause does not deprive the state of *all* power to tax value to which another state may lay a competing and stronger claim. Rather, the state retains the authority to exercise its well-established residence-based taxing rights, except to the extent that the exercise of such power in fact creates a risk of multiple taxation. A properly designed credit fully satisfies that obligation, and the Commerce Clause demands no more.

Hellerstein & Hellerstein, State Taxation ¶ 8.02[1][a][i].

In a recent appeal, the United States Supreme Court reviewed a Maryland tax scheme that had the effect of subjecting a portion of its residents' income earned outside the state to double taxation. *Comptroller of the Treasury of Md. v. Wynne*, —U.S.—, 135 S.Ct. 1787, 1792, 191 L.Ed.2d. 813 (2015). While the dormant Commerce Clause was

deemed to present an impediment to Maryland's raw power to tax its residents' out-of-state income, the Court explained that the state's current scheme of taxation could be cured "by granting a credit for taxes paid to other States." *Id.* at 1806. The Court also did not foreclose that compliance with the Commerce Clause could be achieved in some other way. *Id.*

Although the Commissioner's concern regarding the extent to which Florida could have taxed Popular Categories is not unfounded, his concern does not ultimately militate against a conclusion that Florida, as the taxpayer's legal domicile, had constitutional taxing power. Again, for the reasons expressed above, we are of the opinion that Popular Categories' incorporation in Florida constitutes a sufficient substantial nexus for taxation jurisdiction.

Although the Commissioner cites to the Tennessee Supreme Court's statement in *Broadmoor-Kingsport Apartments, Inc. v. State*, 686 S.W.2d 70, 72 (Tenn. 1985), that "the mere filing of a corporate charter . . . is insufficient" to establish that a corporation is doing business for purposes of franchise and excise taxation, we are of the opinion that the *Broadmoor* decision is not controlling of this matter. The decision in *Broadmoor*, which was concerned with whether Tennessee could impose its taxing jurisdiction, involved inquiry into the concept of "doing business" that was, at the time, not statutorily defined. The Supreme Court specifically noted in *Broadmoor* that the term "doing business" was not uniformly defined by case law. *Id.*; *see also Tidwell v. Gaines Mfg. Co.*, 526 S.W.2d 460, 463 (Tenn. 1975) ("[T]he phrase 'doing business in Tennessee and elsewhere' as used in the Tennessee statutes, is not defined at any point in the legislation."). Inasmuch as the General Assembly has since given shape to this area by providing a definition for what "doing business in Tennessee" means, our understanding should be informed by a construction and application of the language that is now enacted law.

Indeed, as we have previously discussed, the concept of "doing business" essentially has a constitutional standard engrafted into it by statute, with the Tennessee Code defining "doing business in Tennessee" and "doing business within this state" as "any activity purposefully engaged in within Tennessee, by a person with the object of gain, benefit, or advantage, consistent with the intent of the general assembly to subject such persons to the Tennessee franchise/excise tax to the extent permitted by the United State Constitution and the Constitution of Tennessee." *See* Tenn. Code Ann. 67-4-2004(14)(A).[11] Because apportionment is, by statute, dependent on whether there are connections to other states that would constitute "doing business" in Tennessee, *see* Tenn. Code Ann. § 67-4-2010; Tenn. Code Ann. § 67-4-2110, the constitutional standard behind "doing business" requires us to look to see whether the nature of the claimed

---

[11] Again, this citation references the definition's numbering and placement with the current version of the Code.

extraterritorial connections could constitutionally subject the taxpayer to taxation. For the reasons already discussed, we are of the opinion that Popular Categories' incorporation in Florida satisfies this test. Although it appears from the record that Florida did not actually tax Popular Categories in the tax years at issue, this is of no moment. Florida had constitutional nexus to tax, and the accompanying risk of taxation can fuel a Commerce Clause challenge with respect to Tennessee's assessments. *See Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 444 (1980) ("We agree with Mobil that the constitutionality of a Vermont tax should not depend on the vagaries of New York tax policy.").

We note that our understanding that incorporation can afford constitutional "substantial nexus" is one that appears to be currently embraced by portions of both Tennessee and Florida law. Pursuant to the Revenue Modernization Act of 2015, for example, the following provision was passed by our General Assembly:

"Substantial nexus in this state" means any direct or indirect connection of the taxpayer to this state such that the taxpayer can be required under the Constitution of the United States to remit the tax imposed under this part and part 21 of this chapter. Such connection includes, but is not limited to, the following:

(i) **The taxpayer is organized** or commercially domiciled **in this state**[.]

Tenn. Code Ann. § 67-4-2004(49)(A) (emphasis added). Moreover, we observe that the Florida Administrative Code provides as follows:

(1) For taxable years beginning on or after January 1, 1991, corporations will apportion their adjusted federal income in accordance with Section 220.15, F.S., only if they are doing business within and without Florida. A taxpayer will be considered doing business within and without this state if it has income from business activity which is taxable both within and without Florida.

(a) In determining whether or not a taxpayer is doing business within and without Florida, a taxpayer will be considered doing business without this state if the corporation is taxable in another state, provided:

1. That state subjects the business to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or,

2. That state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

(b)1. **States have the jurisdiction to impose an income tax on any corporation that incorporates within their state.  This is true regardless of whether the corporation exists or conducts business within their state**.  Therefore, corporations that have incorporated outside Florida may apportion income in accordance with Section 220.15, F.S.

Fla. Admin. Code Ann. r. 12C-1.015 (emphasis added).

In view of the foregoing discussion and having reached the conclusion that Popular Categories is entitled to apportionment, we reverse the trial court's May 11, 2015 order on partial summary judgment, vacate its March 22, 2017 monetary judgment and its July 6, 2018 judgment awarding the Commissioner his attorneys' fees, and remand for such further proceedings as may be necessary and consistent with this Opinion.  Given this disposition, the issues raised on appeal in connection with the vacated orders are hereby pretermitted.

## CONCLUSION

For the reasons stated in this Opinion, we reverse the trial court's entry of partial summary judgment and vacate its subsequent entry of a final judgment in favor of the Commissioner.

_____
ARNOLD B. GOLDIN, JUDGE