*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

APEX LABORATORIES INTERNATIONAL, INC.,

UNPUBLISHED
January 4, 2024

Petitioner-Appellee,

v

No. 363984
Tax Tribunal
LC No. 16-000724-TT

CITY OF DETROIT,

Respondent-Appellant.

Before: RIORDAN, P.J., and MURRAY and M. J. KELLY, JJ.

MURRAY, J. (*dissenting*)

I respectfully dissent. As discussed below, the record before the Tax Tribunal established a factual question regarding whether Apex Laboratories had a substantial nexus with Detroit such that its net profits could be lawfully taxed. I would therefore vacate that decision and remand for an evidentiary hearing to finally factually resolve this matter.

In this Court's first opinion involving this dispute, *Apex Laboratories Int'l, Inc v Detroit*, unpublished per curiam opinion of the Court of Appeals, issued May 17, 2018 (Docket No. 338218) (*Apex I*), p 1-3, vacated by 503 Mich 1034 (2019), we recounted the facts about Apex's creation and activities:

> A Detroit-based private equity firm, Huron Capital Partners LLC (Huron), solicited investors to acquire partnership interests in a limited partnership, The Huron Fund II, LP (the Fund), which in turn was to acquire shares in existing "lower middle-market" companies. The general partner of the Fund was an entity known as Huron Capital Partners GP II, LLC (the general partner); however, the business operations of the general partner and the Fund were carried out by Huron.
>
> In 2006, Huron recommended that the Fund acquire shares in (as well as debt of) Labstat International, ULC (Labstat), a Canadian company, for eventual sale. As part of the transaction, Apex was incorporated as a Delaware corporation for the sole purpose of holding the shares of Labstat to be acquired by the Fund— Apex never possessed or acquired any other assets. Although Apex possessed a

-1-

Detroit mailing address, it did not have any employees, owned no real or personal property, provided no services, and sold no goods, either in Detroit or elsewhere. Various members and employees of Huron were appointed to Apex's board of directors. Apex never held a board meeting.

Apex earned dividend income from its shares of Labstat in 2010, and paid those dividends to the limited partners of the Fund. Apex paid 1% Detroit city income tax (approximately $70,000) in 2010. In 2012, Apex sold its Labstat shares to a Canadian corporation. According to the securities purchase agreement governing the sale, the closing was to be conducted in the city of Waterloo, in Ontario, Canada. Apex realized significant capital gains from the sale, in the amount of approximately $36 million (Canadian). Apex again paid 1% ($319,000 (U.S.)) in city income tax to Detroit in 2012.

After a remand from the Michigan Supreme Court to this Court, and then from this Court to the Tribunal, the Tribunal addressed the parties' motions for summary disposition, and in doing so considered the recent United States Supreme Court decision in *South Dakota v Wayfair, Inc*, 585 US ___; 138 S Ct 2080; 201 L Ed 2d 403 (2018), which overruled *Quill Corp v North Dakota ex rel Heitkamp*, 504 US 298; 112 S Ct 1904; 119 L Ed 2d 91 (1992), and *Nat'l Bellas Hess, Inc v Dep't of Revenue of Illinois*, 386 US 753; 87 S Ct 1389; 18 L Ed 2d 505 (1967). The Tax Tribunal granted Apex's motion for summary disposition and denied Detroit's motion for summary disposition, holding that it would violate the Commerce Clause for Detroit to tax[1] Apex's net profits.[2]

Specifically, the Tax Tribunal distinguished *Wayfair* (which it was not certain could even be applied retroactively) because Apex, unlike the companies in *Wayfair*, did not have continuous activities and exposure to the taxing locale, and ruled that Apex's activities were, by design, minimal. The tribunal found that Apex lacked nexus with Detroit under the Commerce Clause because it was neither physically nor virtually present in Detroit, and thus Detroit could not impose the taxes.[3]

---

[1] As the majority notes, Detroit imposed a 2% income tax on the "taxable net profits" of Apex on the basis that Apex earned the net profits "as a result of work done, services rendered and other business activities conducted in the city." Detroit City Code § 44-2-8(a)(3); Detroit City Code § 44-2-9(c). "Doing business" is defined as "the conduct of any activity with the object of gain or benefit." Detroit City Code § 44-2-3.

[2] "A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004).

[3] Detroit moved for reconsideration, and although the tribunal partially agreed with Detroit, it again granted summary disposition in favor of Apex because Apex's physical presence in the city was *de minimis* and did not meet the "substantial nexus" requirement of *Wayfair*.

This conclusion is similar to that made by the *Apex I* panel, which held:

> The Tribunal rejected Detroit's argument that, although Apex had no employees, the activities of Apex's officers and directors were conducted on Apex's behalf for its benefit, finding that the evidence showed that Apex's officers and directors acted on behalf of Huron or Labstat, not Apex. That conclusion is supported by the substantial, competent, and material evidence. *Briggs Tax Svc* [, *LLC v Detroit Pub Sch*], 485 Mich [69,] 75 [; 780 NW2d 753 (2010)]. Various officers and directors of Apex, through deposition testimony and affidavits, attested that they were employed by Huron and worked for the benefit of Huron. Essentially, these officers and directors worked to increase the value of Labstat and negotiate the sale of Labstat shares for the benefit of Huron; these activities were not conducted "on behalf" of Apex any more than a business transaction is conducted "on behalf" of the bank account into which the proceeds will be deposited. Moreover, the Tribunal noted that to the extent Apex employed professional consultants, this fell under the exclusion found in MCL 206.621(2)(b). We agree, as the record shows that the use of professional consultants, such as law firms and marketing consultants, was done to facilitate the sale of a Canadian company to a Canadian purchaser in order to benefit the Fund's investors, not to establish or maintain a market in Detroit. Additionally, the Tribunal noted the uncontested fact that Apex was not engaged in the sale of any goods or services in Detroit (or indeed, anywhere), and declined to find that a physical presence or substantial nexus existed between Apex and Detroit based on the use of a Detroit mailing address. [*Apex I*, unpub op at 5-6.] [4]

My disagreement with the majority opinion comes down to its conclusion that as a *matter of law* there is a substantial nexus[5] between Apex's net profit and Detroit. Despite my reluctance to articulate a position that would further prolong what has otherwise been an extraordinarily long case, any desire for efficiencies are overcome by the need to factually resolve who was doing what

---

[4] The majority is correct in that the *Apex I* panel seems to have applied the incorrect standard of review to the tribunal's summary disposition ruling.

[5] An important issue raised by Apex is whether *Wayfair* can be applied retroactively. Although not cited by Apex, at least one court has recently held that it cannot be, *US Auto Parts Network, Inc v Comm'r of Revenue*, 491 Mass 122, 138; 199 NE3d 840 (2022), and as noted, the Tribunal determined it likely should not be retroactively applied. At oral argument before this Court, however, the parties seemed to concede that it would not matter, because if *Wayfair* was not applied retroactively, the "physical presence" test from *Quill* would apply and cover Apex. I am not as certain. Many courts across the nation held prior to *Wayfair* that the *Quill* test was limited to sales and use taxes, and not to income taxes. See, e.g., *Bridges v Geoffrey, Inc*, 984 So2d 115, 128 ; 2007-1063 (La App 1 Cir 2/8/08); *Tax Comm'r v MBNA America Bank, NA*, 220 W VA 163, 169; 640 SE2d 226 (2006); *Geoffrey, Inc v Comm'r of Revenue*, 453 Mass 17, 26-27; 899 NE2d 87 (2009). These courts resolved the income tax/Commerce Clause issue by utilizing the "substantial nexus" test without regard to physical location. Thus, even if *Wayfair* was not retroactively applied, the same substantial nexus test would apply.

on behalf of whom during the relevant time. To do so, the Tribunal should hold an evidentiary hearing.

A nexus is substantial with the taxing state "when the taxpayer . . . avails itself of the substantial privilege of carrying on business in that jurisdiction." *Wayfair*, 138 S Ct at 2099 (quotation marks and citation omitted). Here, in light of the controlling law and myriad factual questions, it is impossible to determine on appeal whether Apex had a substantial nexus with Detroit. With respect to the law, no one disputes that corporations are treated as separate entities. See *Wells v Firestone Tire & Rubber Co*, 421 Mich 641, 650; 364 NW2d 670 (1984) ("We recognize the general principle that in Michigan separate entities will be respected."); *Rymal v Baergen*, 262 Mich App 274, 293; 686 NW2d 241 (2004) ("The law treats a corporation as an entirely separate entity from its shareholders, even where one individual owns all the corporation's stock."). So, Apex and Huron Capital are valid, separate entities. One employs people and owns property in Detroit (Huron), while the other does not (Apex). It is in fact undisputed that Apex owns no property, employs no one, makes no sales of goods or services, produces no materials, and has the sole purpose of holding the stock shares from the original purchase of Labstat. However, corporations act only through their officers and employees, *Altobelli v Hartmann*, 499 Mich 284, 296-297; 884 NW2d 537 (2016), and Apex and Huron shared common officers—Brian Demkowicz, Michael Beauregard, Christopher Sheeren, and Nicholas Barker. Each of them were active officers or employees of Huron, while also serving as directors of Apex.

The majority concludes that the activities of Demkowicz, Beauregard, Sheeren and Barker, relative to the sale of Labstat, were done in their roles as directors or officers of Apex. The majority cites facts purporting to show that the Apex and Huron officers did all their work out of Huron's Detroit offices, but I fail to see the definitive proof that they were working on behalf of Apex when doing so, such that summary disposition on this issue was appropriate. After all, each was also employed by Huron, which was active in not only overseeing Labstat's initial purchase and subsequent growth, but was also hired by Apex to manage much of the details in closing the Labstat sale in 2012.[6] So perhaps, if seeing these gentlemen testify in person, their testimony that they were acting on behalf of Huron when conducting the transactions would be believed by the tribunal. Or not. But with all the moving parts between Apex, Huron, and Labstat, it is difficult to determine *as a matter of law* that Apex had a substantial nexus to Detroit through these individuals. And again, no dispute exists but that Apex was validly created to hold Labstat stock shares while Huron oversaw the "build-up" of Labstat and ultimately assisted in its sale. It was a Delaware corporation with no ownership of any real or personal property in Detroit, no employees in Detroit, no sales or services offered in Detroit, and when the sale was completed, the money was wired to an account outside of Detroit.

---

[6] Contrary to what Apex's counsel stated at oral argument, the contract with Huron was between Apex and Huron, not Labstat and Huron. Demkowicz signed the contract on behalf of both entities, again making the record unclear as to who was doing what for whom. And though the contract exhibits some business activity on the part of Apex, it does not reflect any business activity related to income, just an expenditure.

-4-

For these reasons, I would hold that there was a genuine issue of material fact whether Apex established a nexus with Detroit by "avail[ing] itself of the substantial privilege of carrying on business in [Detroit]." *Wayfair*, 138 S Ct at 2099 (quotation marks and citation omitted).


/s/ Christopher M. Murray