*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

APEX LABORATORIES INTERNATIONAL, INC.,

UNPUBLISHED
January 4, 2024

Petitioner-Appellee,

v

No. 363984
Tax Tribunal

CITY OF DETROIT,

LC No. 16-000724-TT

Respondent-Appellant.

Before: RIORDAN, P.J., and MURRAY and M. J. KELLY, JJ.

PER CURIAM.

In this income-tax dispute, respondent, the city of Detroit, appeals as of right the Tax Tribunal's order granting in part Detroit's motion for reconsideration, while also granting summary disposition in favor of petitioner, Apex Laboratories International, Inc. For the reasons provided below, we reverse and remand to the Tax Tribunal for further proceedings.

## I. BACKGROUND

This case arises out of Detroit's attempt to assess and collect income tax from Apex for the period covering May 1, 2012, through April 30, 2013, and returns to this Court for a third time. The pertinent background is summarized in this Court's initial opinion, *Apex Labs Int'l, Inc v Detroit*, unpublished per curiam opinion of the Court of Appeals, issued May 17, 2018 (Docket No. 338218) (*Apex I*), pp 1-3, vacated 503 Mich 1034 (2019):

> A Detroit-based private equity firm, Huron Capital Partners LLC (Huron), solicited investors to acquire partnership interests in a limited partnership, The Huron Fund II, LP (the Fund), which in turn was to acquire shares in existing "lower middle-market" companies. The general partner of the Fund was an entity known as Huron Capital Partners GP II, LLC (the general partner); however, the business operations of the general partner and the Fund were carried out by Huron.
>
> In 2006, Huron recommended that the Fund acquire shares in (as well as debt of) Labstat International, ULC (Labstat), a Canadian company, for eventual

-1-

sale. As part of the transaction, Apex was incorporated as a Delaware corporation for the sole purpose of holding the shares of Labstat to be acquired by the Fund— Apex never possessed or acquired any other assets. Although Apex possessed a Detroit mailing address, it did not have any employees, owned no real or personal property, provided no services, and sold no goods, either in Detroit or elsewhere. Various members and employees of Huron were appointed to Apex's board of directors. Apex never held a board meeting.

Apex earned dividend income from its shares of Labstat in 2010, and paid those dividends to the limited partners of the Fund. Apex paid 1% Detroit city income tax (approximately $70,000) in 2010. In 2012, Apex sold its Labstat shares to a Canadian corporation. According to the securities purchase agreement governing the sale, the closing was to be conducted in the city of Waterloo, in Ontario, Canada. Apex realized significant capital gains from the sale, in the amount of approximately $36 million (Canadian). Apex again paid 1% ($319,000 (U.S.)) in city income tax to Detroit in 2012.

In 2015, Apex received a proposed assessment from Detroit indicating that Detroit had conducted an audit and had determined that Apex had miscalculated the income tax it owed for the 2010 and 2012 tax years. Detroit assessed Apex an additional $3,280.48 in tax, interest, and penalties for the 2010 tax year, and an additional $401,165.51 for the 2012 tax year. Apex objected on the ground that it did not conduct business within the city of Detroit and lacked the required nexus necessary for the assessment of taxes by Detroit. Apex requested a refund of the taxes paid for the 2010 and 2012 tax years. Detroit denied the request. Apex appealed that decision to the Tribunal in 2016.

The parties filed cross-motions for summary disposition under MCR 2.116(C)(10); the dispositive issue was whether Apex possessed the requisite constitutional "nexus" with Detroit to render it subject to Detroit's taxing authority. Apex argued in the alternative that it was exempt from city income tax as a qualifying financial institution, and that if it was liable for taxation, its income should be subject to apportionment. Following a hearing on the parties' motions, the Tribunal issued a written opinion and order granting Apex's motion, denying Detroit's motion, and ordering that a refund of taxes, interest, and penalties paid by Apex be issued.

The Tribunal held that Apex did not "do business" in Detroit within the meaning of the city income tax act, MCL 141.501 *et seq*., because, although Apex was "doing business" under MCL 141.605, it was not doing business in Detroit; in other words, Apex lacked the constitutional "nexus" with Detroit to be subject to taxation. The Tribunal held that Detroit had not established that Apex (1) had a "commercial domicile" within the city or (2) had sufficient "physical presence" in the city to establish such a nexus. The Tribunal also rejected Detroit's "unitary business group" theory on the ground that it was an "apportionment concept and not a method to determine nexus." The Tribunal did not address Apex's alternative argument.

Detroit appealed, and this Court affirmed the tribunal's decision. *Apex I*, unpub op at 1, 6. Although the issues before this Court involved the tribunal's decisions on competing motions for summary disposition, this Court employed the "multifaceted" standard of review for appeals from the Tax Tribunal, stating:

> "If fraud is not claimed, this Court reviews the Tax Tribunal's decision for misapplication of the law or adoption of a wrong principle. We deem the Tax Tribunal's factual findings conclusive if they are supported by competent, material, and substantial evidence on the whole record. But when statutory interpretation is involved, this Court reviews the Tax Tribunal's decision de novo." [*Id*. at 3, quoting *Briggs Tax Serv, LLC v Detroit Pub Schs*, 485 Mich 69, 75; 780 NW2d 753 (2010).[1]]

While affirming, this Court repeatedly relied on this general, highly deferential standard of review, where reversal is only warranted when the tribunal misapplied the law, adopted a wrong legal principle, or made factual findings that were not supported by competent, material, and substantial evidence. See *Apex I*, unpub op at 4-6.

After this Court issued its decision in *Apex I*, the United States Supreme Court decided *South Dakota v Wayfair, Inc*, 585 US ___; 138 S Ct 2080; 201 L Ed 2d 403 (2018), which overruled *Quill Corp v North Dakota ex rel Heitkamp*, 504 US 298; 112 S Ct 1904; 119 L Ed 2d 91 (1992), and *Nat'l Bellas Hess, Inc v Dep't of Revenue of Illinois*, 386 US 753; 87 S Ct 1389; 18 L Ed 2d 505 (1967). The day after *Wayfair* was decided, Detroit filed its application for leave to appeal in our Supreme Court. In *Apex Labs Int'l Inc v Detroit*, 504 Mich 1034 (2019) (*Apex II*), our Supreme Court, in lieu of granting leave to appeal, vacated *Apex I* and remanded to this Court for reconsideration in light of *Wayfair*.

On remand, this Court determined that "under the circumstances of this case, remand is required for the Tribunal to address the impact of *Wayfair* and the overruling of *Quill* and *Bellas Hess*, and if necessary, to address Apex's alternative arguments." *Apex Labs Int'l, Inc v Detroit (On Remand)*, 331 Mich App 1, 9; 951 NW2d 45 (2020) (*Apex III*). This Court therefore vacated the tribunal's judgment granting summary disposition in favor of Apex and remanded to that agency "to allow the parties to focus their arguments concerning *Wayfair*, *Quill*, and the Due Process and Commerce Clauses, and to allow the Tribunal to make a ruling in the first instance." *Id*. at 10.

On remand to the Tax Tribunal, both parties filed supplemental briefs addressing *Wayfair* and Apex's potential nexus with Detroit, and both parties filed competing motions for partial summary disposition.

After holding a hearing on the competing motions, the Tax Tribunal, in a final opinion and judgment, granted Apex's motion for summary disposition and denied Detroit's motion for summary disposition. Detroit moved for reconsideration, and although the tribunal partially

---

[1] This Court also did cite a de novo standard for reviewing motions for summary disposition, but as described below, this Court nonetheless seemed to rely on the more deferential standard.

agreed with Detroit, it again granted summary disposition in favor of Apex because Apex's physical presence in the city was de minimis and did not meet the "substantial nexus" requirement of *Wayfair*. Furthermore, even assuming that Apex had a nexus with Detroit, the tribunal ruled that no tax was assessable because Apex had no "in-city" business in Detroit. The Tax Tribunal therefore ruled that Apex was not subject to income taxation by Detroit. This appeal followed.

## II. SUMMARY DISPOSITION

"The standard of review of Tax Tribunal cases is multifaceted." *Briggs*, 485 Mich at 75. "If fraud is not claimed, this Court reviews the Tax Tribunal's decision for misapplication of the law or adoption of a wrong principle. We deem the Tax Tribunal's factual findings conclusive if they are supported by competent, material, and substantive evidence on the whole record." *Id*. (quotation marks and citations omitted). However, issues of law, such as statutory interpretation and rulings on motions for summary disposition, are reviewed de novo. *Id*. Thus, because the issues before the tribunal in this case involved the parties' competing motions for summary disposition, the standard of review is de novo. A court deciding a motion for summary disposition is prohibited from making any factual findings. *In re Handelsman*, 266 Mich App 433, 437; 702 NW2d 641 (2005).

While Detroit argues that the Tax Tribunal erred when it granted Apex's motion for summary disposition, there are two components to the tribunal's ruling that must be considered. The first is its ruling that Apex did not have a substantial nexus with Detroit.[2] The second is how, if taxation is proper, Apex's income should be apportioned. This latter aspect is discussed later in Part II-B of this opinion.

"A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint." *Maiden v Rozwood*, 461 Mich 109, 119; 597 NW2d 817 (1999). "In evaluating such a motion, a court considers the entire record in the light most favorable to the party opposing the motion, including affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties." *Corley v Detroit Bd of Ed*, 470 Mich 274, 278; 681 NW2d 342 (2004). The motion should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Kisiel v Holz*, 272 Mich App 168, 170; 725 NW2d 67 (2006). As already mentioned, a court is precluded from making any factual findings when ruling on a motion for summary disposition. *In re Handelsman*, 266 Mich App at 437.

### A. NEXUS

As of 2012, Detroit imposed a 2% income tax "on the taxable net profits of a corporation doing business in the city, being levied on such part of the taxable net profits as is earned by the corporation as a result of work done, services rendered and other business activities conducted in the city." Detroit City Code § 44-2-8(a)(3); Detroit City Code § 44-2-9(c). "Doing business" is

---

[2] Detroit mischaracterizes the tribunal's ruling as concluding that Apex had a nexus. While the tribunal's opinion did mention at one point that there was a nexus, it later ruled that Apex's activities did not meet the "substantial nexus" requirement of *Wayfair*.

in turn defined as "the conduct of any activity with the object of gain or benefit." Detroit City Code § 44-2-3.[3]

Apex is a Delaware corporation. The Commerce Clause of the United States Constitution prohibits states from discriminating against interstate commerce and prohibits states from imposing undue burdens on interstate commerce.[4] *Wayfair*, 138 S Ct at 2091. A tax is permissible on a foreign company so long as it "(1) applies to an activity with a substantial nexus with the taxing State, (2) is fairly apportioned, (3) does not discriminate against interstate commerce, and (4) is fairly related to the services the State provides." *Id.*, citing *Complete Auto Transit, Inc v Brady*, 430 US 274, 279; 97 S Ct 1076; 51 L Ed 2d 326 (1977); see also *Gillette Co v Dep't of Treasury*, 198 Mich App 303, 313; 497 NW2d 595 (1993). Before the Supreme Court's decision in *Wayfair*, a substantial nexus could *only* exist if a company had a physical presence in the state. *Wayfair*, 138 S Ct at 2091-2092; *Quill*, 504 US at 317-318.

The Supreme Court in *Wayfair* overruled *Quill*, noting that "the physical presence rule is not a necessary interpretation of the requirement that a state tax must be 'applied to an activity with a substantial nexus with the taxing State.' " *Wayfair*, 138 S Ct at 2092, quoting *Complete Auto*, 430 US at 279. The Court also noted that *Quill*, because it provided an advantage to businesses with no physical presence, created, rather than resolved, market distortions. *Wayfair*, 138 S Ct at 2092, 2094; see also *id.* at 2094 ("In effect, *Quill* has come to serve as a judicially created tax shelter for businesses that decide to limit their physical presence . . . ."). Finally, the Court stated that the rule from *Quill* imposed the type of "arbitrary, formalistic distinction that the Court's modern Commerce Clause precedents disavow." *Id.* at 2092. As such, the Court overruled the portion of *Quill* pertaining to the Commerce Clause and nexus. *Id.* at 2099.

In deciding whether a tax on a foreign company is permissible because the tax applies to an activity with a substantial nexus with the taxing state, "[s]uch a nexus is established when the

---

[3] The city code provides for a safe harbor for companies by excluding the following conduct as "doing business," of which none is implicated in this case:

> (1) The solicitation of orders by a person or such person's representative in the City, for sales of tangible personal property, which orders are sent outside the City, for approval or rejection and which, if approved, are filled by shipment or delivery from a point outside the City; or

> (2) The solicitation of orders by a person or such person's representative in the City, in the name of, or for the benefit of, a prospective customer where such orders are to enable the customer to fill orders resulting from the solicitation of orders as described in Subsection (1) of this definition; or

> (3) The mere storage of personal property in the City in a warehouse which is neither owned nor leaved by the taxpayer. [Detroit City Code § 44-2-3.]

[4] The Due Process Clause also prevents a state from taxing foreign companies under certain circumstances, but our focus in this case is on the Commerce Clause.

taxpayer . . . avails itself of the substantial privilege of carrying on business in that jurisdiction." *Id.* at 2099 (quotation marks and citations omitted). But, although having a physical presence is no longer required to establish a nexus, when physical presence exists, it still can establish a nexus. See *id.* at 2093 ("Physical presence is not *necessary* to create a substantial nexus.") (emphasis added). That is because physical presence in a jurisdiction is a company's express availing of the substantial privilege of carrying on business in that jurisdiction. See *id.*

In this instance, because the issue is whether the Tax Tribunal properly granted Apex's motion for summary disposition, the submitted evidence must be viewed in a light most favorable to Detroit. See *Corley*, 470 Mich at 278.

Although Apex is a Delaware corporation, it listed in its Delaware filings that Detroit was its principal place of business. It is undisputed that Apex had no employees and owned no property in the city. Apex's officers and directors engaged in activities to sell an asset that Apex owned, which was its interest in Labstat. Further, those officers and directors undertook their efforts in Detroit. The officers and directors of Apex were Brian Demkowicz, Michael Beauregard, Christopher Sheeren, and Nicholas Barker. All of them, in addition to being directors or officers of Apex, were employees of Huron Capital Partners and had their offices in Huron Capital's headquarters in Detroit, which is where they were physically present when they went to work. No evidence was introduced showing that the work associated with the Labstat sale was performed exclusively outside of Detroit. On the contrary, it was established that those individuals held meetings in Detroit regarding the sale of Labstat and performed other work in Detroit related to Labstat. Moreover, those individuals used equipment, such as phones and computers, in Detroit in furtherance of the growing and selling of Labstat.

Apex's reliance on the self-serving testimony of its officers that they never acted for the benefit of Apex and instead were acting on behalf of Huron Capital is misplaced. Regardless of what the officers' subjective motivations purportedly were, they legally were acting on behalf of Apex. See *Mossman v Millenbach Motor Sales*, 284 Mich 562, 568; 280 NW 50 (1938) (stating that a corporation can only act through its agents). In addition, there is no legal basis for allowing Apex's officers and agents, when performing duties for Apex, to be under the control of Huron Capital because Huron Capital did not own Apex. Apex instead was owned by Huron Fund II, which is a separate entity from Huron Capital, and is in turn owned by a collection of limited partners. Indeed, as part of the consideration to sell its ownership of the Labstat stock, Apex agreed to receive, in addition to $32 million in Canadian currency, a contingent promissory note for $5 million. That promissory note named Apex as the sole payee and did not mention Huron Capital or any other payee.

In sum, Apex's officers and agents, located in the city of Detroit, took many actions on behalf of Apex in conjunction with the sale of the Labstat stock. These actions are sufficient to show that there was a nexus between Apex and Detroit, and the Tax Tribunal erred when it ruled otherwise and granted Apex's motion for summary disposition on this issue. Furthermore, viewing the evidence in a light most favorable to Apex, to determine whether summary disposition should be granted in favor of Detroit, results in the same conclusion—the work was primarily done in Detroit. While there may have been some exceptions, such as reading some documents at home or while traveling, no evidence demonstrated that Apex's principal place of business was anywhere but Detroit. Consequently, Apex established a nexus with Detroit because it "avail[ed] itself of

the substantial privilege of carrying on business in [Detroit]." *Wayfair*, 138 S Ct at 2099 (quotation marks and citations omitted).

We are aware that this Court in *Apex I* reached a different conclusion. First, the familiar law-of-the-case doctrine[5] is not implicated because *Apex I* ultimately was vacated by our Supreme Court and therefore did not decide any issues. *Apex II*, 504 Mich 1034. Second, this Court in *Apex I* seemed to apply the incorrect legal standard when ruling on motions for summary disposition. Instead of truly conducting a de novo review of a decision on a motion for summary disposition where factual findings are not permissible, this Court framed some of the Tribunal's rulings as "findings" and deferred to those rulings because there was "substantial, competent, and material evidence" on the record. *Apex I*, unpub op at 4-6. Not only is this the incorrect standard of review for reviewing decisions on motions for summary disposition, see *Briggs*, 485 Mich at 75, it also mischaracterizes a court's function when deciding motions for summary disposition by suggesting that factual findings are permissible.

## B. ALLOCATION

Detroit next argues that the Tax Tribunal erroneously allocated none of Apex's income to Detroit. We conclude that the tribunal erred by granting summary disposition in favor of Apex, but we disagree that Detroit was entitled to summary disposition because neither party was entitled to summary disposition.

Even though a company has a nexus with Detroit, it does not mean that Detroit can necessarily tax the entirety of the company's income. The relevant ordinance provides, in pertinent part:

> The tax under this article shall apply on the taxable net profits of a corporation doing business in the City, being levied *on such part of the taxable net profits as is earned by the corporation as a result of work done, services rendered and other business activities conducted in the city*, as determined in accordance with this article. [Detroit City Code, § 44-2-9(c) (emphasis added).]

Further,

> [w]hen the entire net profit of a business subject to the tax is not derived from business activities exclusively within the city, the portion of the entire net profit, earned as a result of work done, services rendered or other business activity conducted in the city, shall be determined under either [MCL 141.619], [MCL 141.620 to MCL 141.624], or [MCL 141.625]. [MCL 141.618.]

---

[5] Under the law-of-the-case doctrine, an appellate court's decision on a particular issue binds both the trial courts and other appellate panels in subsequent appeals of the case. *Grievance Administrator v Lopatin*, 462 Mich 235, 259-260; 612 NW2d 120 (2000). The law of the case applies to issues actually decided in the prior appeal. *Id*.

MCL 141.619 relates to "the separate accounting method" and is not relevant to this case. MCL 141.620 to MCL 141.624 "set forth the three-factor formula, known as the 'business allocation percentage method,' for calculating the taxable 'net profit of a business.' " *Honigman Miller Schwartz & Cohn, LLP v Detroit*, 505 Mich 284, 296; 952 NW2d 358 (2020). MCL 141.620 introduces the three-factor formula:

> The business allocation percentage method shall be used if such taxpayer is not granted approval to use the separate accounting method of allocation. The entire net profits of such taxpayer earned as a result of work done, services rendered or other business activity conducted in the city shall be ascertained by determining the total "in-city" percentages of property, payroll and sales. "In-city" percentages of property, payrolls and sales, separately computed, shall be determined in accordance with [MCL 141.621 to MCL 141.624]. [MCL 141.620.]

MCL 141.621 pertains to the first factor, the property factor:

> First, the taxpayer shall ascertain the percentage which the average net book value, of the tangible personal property owned and the real property . . . owned or used by it in the business and situated within the city during the taxable period, is of the average net book value of all such property . . . owned or used by the taxpayer in the business during the same period wherever situated. . . .

For the payroll factor, MCL 141.622 states:

> Second, the taxpayer shall ascertain the percentage which the total compensation paid to employees for work done or for services performed within the city is of the total compensation paid to all the taxpayer's employees within and without the city during the period covered by the return. For allocation purposes, compensation shall be computed on the cash or accrual basis in accordance with the method used in computing the entire net income of the taxpayer. . . .

For the final factor, the revenue factor, MCL 141.623 provides:

> Third, the taxpayer shall ascertain the percentage which the gross revenue of the taxpayer derived from sales made and services rendered in the city is of the total gross revenue from sales and services wherever made or rendered during the period covered by the return.
>
> (1) For the purposes of this section, "sales made in the city" means all sales where the goods, merchandise or property is received in the city by the purchaser, or a person or firm designated by him. . . .
>
> * * *
>
> (3) In case the business of the taxpayer involves substantial business activities other than sales of goods and services such other method or methods of allocation shall be employed as shall reasonably measure the proportion of gross revenue obtained in the city by such business.

-8-

Under MCL 141.624, the average of those three percentages is the "business allocation percentage." However, if a factor does not exist anywhere for a business, then that factor is omitted completely. MCL 141.624. In other words, if only two factors are present, then the average is taken from those two factors, and if only one factor is present, then that percentage is used for the "business allocation percentage."

The Tax Tribunal ruled that no income should be apportioned to Detroit because Apex

> (1) had no personal or real property in the City of Detroit within the meaning of MCL 141.621, (2) had no employees to which it paid compensation for work done or services performed in the City of Detroit within the meaning of MCL 141.622, and (3) had no gross revenue derived from sales made and services rendered in the City [of] Detroit within the meaning of MCL 141.623.

Put another way, the numerators for each of the three factors was zero.

Detroit argues that the alternative method described in MCL 141.625 should have been utilized because none of the three factors was present in this case, which yields a fraction of zero divided by zero, which is mathematically undefined. In other words, Detroit contends that because none of the three factors is present, the three-factor system is inapplicable and the alternative mentioned in MCL 141.625, as authorized by MCL 141.623(3), should be utilized. Again, MCL 141.623(3) provides:

> In case the business of the taxpayer involves substantial business activities other than sales of goods and services such other method or methods of allocation shall be employed as shall reasonably measure the proportion of gross revenue obtained in the city by such business.

This provision is applicable here. The business of Apex involved "substantial business activities other than the sales of goods and services." Apex's sole business activities instead involved the retention and sale of Labstat stock, and stock is not a "good." See MCL 440.2105 (Michigan's UCC defining "goods" as all things that are movable at the time of identification and omitting "investment securities" from that definition). Thus, the Tax Tribunal made an error of law when it implicitly ruled that MCL 141.623(3) was inapplicable.[6]

That error, however, appears to be harmless because the Tax Tribunal, albeit briefly, considered allocation under MCL 141.625. The tribunal rejected Detroit's earlier argument that liability should be determined under that provision.[7] That section provides, "An alternative

---

[6] The Tribunal did not expressly address MCL 141.623(3) in its final order.

[7] Apex avers that the issue is not preserved. However, as the Tax Tribunal recognized, Detroit raised the argument that MCL 141.625 applies earlier in the proceedings. Thus, the issue is preserved. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Further, "[n]o exception need be taken to a finding or decision." MCR 2.517(A)(7). In this instance, no preservation steps needed to be taken because the Tax Tribunal addressed and decided

method of accounting shall be used if the taxpayer or the administrator demonstrates that the net profits of the taxpayer allocable to the city cannot be justly and equitably determined under the separate accounting method or the business allocation percentage method . . . ." MCL 141.625. The tribunal ruled that this alternative method is not applicable because of "the very minimal presence and activities conducted by [Apex's] agents in the City of Detroit." The Tribunal also rejected Detroit's contention that 100% of Apex's business activities were conducted in Detroit, relying on the fact that the closing of the Labstat sale occurred in Canada.

We are inclined to disagree with the tribunal's ruling. It is not clear how Apex, who had no presence anywhere other than in the offices of Capital Partners in Detroit, had "very minimal presence" in Detroit. In essence, as discussed earlier, all of Apex's business was conducted in the city. Its directors, officers, and agents all performed duties related to the sale of Labstat on behalf of Apex in Detroit. Thus, even assuming that those activities were somehow "minimal" in terms of the number of hours spent on the activities, the evidence nonetheless shows that these activities constituted 100% of Apex's activities. As such, we disagree that Apex's presence in Detroit or its activities can be deemed "minimal."

The tribunal also relied on the fact that the sale ultimately occurred in Canada, reasoning that this fact shows that Apex did not conduct 100% of its business in Detroit. There is no dispute that the closing was done remotely. But while the closing was done remotely in Canada, there was no evidence that any agent of Apex was present in Canada for the closing. Instead, the evidence shows that Apex's agents, while in Detroit, performed all of their work related to the sale. The fact that the documents were collected in Canada and the transaction was finalized in Canada does not alter the salient point that the evidence shows that Apex performed its work to effectuate the sale wholly in Detroit. On this basis, we reverse and remand for the Tax Tribunal to determine what alternate method of accounting under MCL 141.625 should be used to determine the net profits of the taxpayer allocable to Detroit. Put another way, due to the nebulous "alternative method of accounting" to be employed, no party was entitled to summary disposition on the issue of allocation, and further proceedings are warranted. See *Borman's, Inc v Detroit*, 386 Mich 250, 257; 191 NW2d 367 (1971) (explaining that because the taxpayer's proposed method of allocation clearly did not justly and equitably allocate its profits, remand was necessary to have the trial court determine which alternative method should be implemented).

In sum, the Tax Tribunal erred when, while granting Apex's motion for summary disposition, it ruled that the three-factor accounting method applied. Because Apex's business "involves substantial business activities other than sales of goods and services," another method of allocation must be used. MCL 141.623(3). The only other applicable method resides in MCL 141.625, which permits "[a]n alternative method of accounting" to be used. Ultimately, what type of method to use necessarily involves the exercise of discretion and is not properly considered on summary disposition. Therefore, we reverse and remand for further non-summary-disposition proceedings.

---

the matter, granting summary disposition in favor of Apex on the basis of allocating all of Apex's income to outside of Detroit.

## III. CONCLUSION

We reverse and remand to the Tax Tribunal for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Riordan
/s/ Michael J. Kelly